| | |
|---|---|
| MICHAEL J. PRATT, Administrator<br>of the Estate of Eric J. Pratt, Deceased,<br><br>    Plaintiff<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION, d/b/a AMTRAK;<br>NEW ENGLAND CENTRAL RAILROAD, INC.,<br>MICHAEL E. KUJALA AND WILLIAM C. RAE,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. 2:13-cv-00197<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, for his Memorandum in Opposition to Defendants' Motion For Summary Judgment, states as follows:

Introduction

    Despite Defendants' characterization of the incident as an attempt to "beat the train," there is no evidence that Eric Pratt was even aware of the presence of the fast-moving Amtrak train until fractions of a second before it struck him. Few, if any, of Defendants' statements of fact are supported by the evidence that has been uncovered through discovery in this case.[1]

    Chief among Defendants' evidentiary failures is the piece of evidence that they rely on most regarding the speed, movement and horn activation of the train that struck Eric Pratt. To date, Defendants have produced three separate electronic accounts of the same collision; none of

---

[1] For the purposes of this memorandum in opposition, citations to Plaintiff's Response to Defendants' Statement of Undisputed Facts will be abbreviated as RSUF including the paragraph number. For example (**RSUF ¶ 1**). Citations to Plaintiff's Statement of Additional Undisputed Facts will be abbreviated as SAUF including the paragraph number. For example (**SAUF ¶ 1**).

which can be reconciled with the others.  Two distinctly different printouts of data from the event data recorder on board the train at the time of the collision have been produced in discovery.  The pertinent data regarding the details of the collision that caused Eric's death  differ from one printout to the next.  In addition, Defendants produced a video recording of the incident taken from the onboard video camera on the Amtrak train. The video also cannot be reconciled with the data from either version of the event recorder print. Defendant Amtrak's RULE 30(b)(6) witness testified that the various versions of the same event cannot be reconciled and there is no way to definitively determine which is the accurate account.

     If properly functioning and not subjected to alteration, all three data and video recordings of the collision should reflect the exact same pertinent information. The fact that they do not, coupled with the fact that Defendant Amtrak failed to document the chain of custody for the event recorder data and video recorder data, render this evidence useless for the purposes of summary judgment.  In other words, Defendants' own alleged undisputed facts derived from the event recorder print out are easily disputed by the alternative event recorder printout that contains different information, as well as the video recording that presents a third version of the incident.

     Defendants' second major evidentiary support relied upon in their motion is the factual account of what occurred leading up to and during the collision it killed Eric Pratt. Defendants rely heavily on an affidavit of Mr. Kyle Shippee, a friend of Eric Pratt's who was present at the time of the collision.  The affidavit was drafted by defense counsel prior to even considering Mr. Shippee's account of the collision and was obtained by defense counsel from Kyle Shippee while he was a minor with a history of learning disabilities, including reading comprehension. Fortunately, Mr. Shippee gave his deposition  subsequent to the filing of the affidavit in this

motion. In his deposition, Mr. Shippee gave a more detailed and accurate account of the events in his own words that stands in stark contrast to the questionable affidavit on which Defendants rely so heavily in their motion. Nearly every statement from the affidavit drafted by defense counsel is disputed by the actual testimony of Mr. Shippee.

As a result of these evidentiary failures, nearly every one of the more than 70 statements of undisputed fact presented by Defendants are clearly disputed and raise questions of material fact that preclude the entry of summary judgment in Defendants' favor.

## Discussion

Defendant's motion should be denied because the basic premises upon which it rests are in dispute which raises genuine disputes of material fact that preclude a grant of summary judgment. Whether or not the train horn was sounded at all, or sounded in an appropriate manner, is disputed. All of the facts that Defendants cite related to Eric Pratt's awareness come from an affidavit of witness Kyle Shippee, obtained under questionable circumstances. Mr. Shippee has since given extensive deposition testimony that disputes the vast majority of the account in the affidavit, which was drafted by defense counsel rather than Mr. Shippee in the first place. Because Defendants have failed to present any substantive evidence that Bemis Road is in fact a private road, summary judgment in reliance on that alleged fact is not appropriate.

Defendants' motion rests heavily on data derived from the printout of the event data recorder onboard the lead locomotive at the time it struck and killed Eric Pratt. Defendant Amtrak's own corporate representative testified that the event data recorder printout that Defendants rely upon in support of their motion is not reliable. This was revealed in his deposition when counsel for Plaintiff obtained a copy of a printout that the Amtrak witness brought with him to the deposition. Although it appeared to be a printout of the event data

recorder for this incident, it contained data that was different from the original printout produced in discovery, and different from the video recording of the incident. The Amtrak witness, Mr. Harald Keuerleber, could not account for this difference, nor could he vouch for the authenticity of any of the data because the chain of custody document for the data did not exist. The implications of different printouts that should be exactly the same if unaltered are far-reaching and will likely be the subject of a motion for relief by Plaintiff in the future. However, whatever the circumstances of the mysterious alternative data is, it certainly calls into question all of the electronically recorded evidence relied upon by Defendants to support their motion. At a minimum, this evidence raises genuine disputes of material fact that preclude a grant of summary judgment.

> **A.  Defendants' Motion Should be Denied Because Genuine Issues of Material Fact Exist with Respect to Eric's Pratt's Awareness of the Oncoming Train.**

There is no undisputed evidence that Eric Pratt was aware of the oncoming train at any time prior to the moment before he was struck and killed. Subsequent to the filing of Defendants' motion, nearly all of the evidence Defendants cited in support of their motion was refuted through deposition testimony. Due to scheduling difficulties on both sides of the case, the deposition of Amtrak's 30(b)(6) witnesses and the deposition of Kyle Shippee fell after the deadline for the filing of dispositive motions. Rather than request that the deadline be extended, for reasons unknown to Plaintiff, Defendants chose to file their motion for summary judgment before obtaining this critical deposition testimony. That choice was fatal to their motion because the testimony taken in those subsequent depositions raised disputes to nearly all of the statements of undisputed fact that Defendants have submitted.

> **1.  The statements of fact that Defendants rely upon from Mr. Shippee are disputed now that he has given his deposition testimony.**

All of the facts upon which Defendants rely to support Eric Pratt's "awareness" of the train are in dispute.   Mr. Kyle Shippee,  Eric Pratt's friend, neighbor and witness to the incident recently gave extensive deposition testimony regarding the incident. This deposition occurred sometime after his questionable affidavit that Defendants' rely so heavily upon in support of their motion.

Mr. Hemley, attorney for Defendant Amtrak, contacted Shippee after the collision and obtained the affidavit from him that Defendants have cited in support of their motion. **(SAUF ¶ 7)** Mr. Hemley, while interviewing Shippee at his mother's home, wrote down additional statements and then wrote arrows to where Mr. Hemley believed they belonged in the affidavit. **(SAUF ¶ 8)** Mr. Hemley then notarized the affidavit personally. **(SAUF ¶ 9)** Shippee did not understand the affidavit when he signed it.  He has a learning disability particularly involving reading comprehension. **(SAUF ¶¶ 10-11)** In addition, Shippee cannot read cursive writing and; therefore, could not understand the items written into the affidavit by Hemley, or the relevance of their placement. **(SAUF ¶ 12)**

When permitted to answer in his own words and his using his own memory of the chronology of the events leading up to Eric's death, Shippee's testimony disputes the vast majority of the statements attributed to him by Defendants from the affidavit that their own lawyer drafted prior to getting Shippee's version.

Shippee testified that he did not know what Eric heard while they were in Shippee's driveway shortly before crossing the tracks;  **(SAUF ¶ 3)**  that Eric never said anything to Shippee in response to Shippee's "beat the train" statement; **(Exhibit A, 33:8-34:8)** that Eric never uttered the phrase himself; **(Exhibit A, 15:4-15:9)** that Eric never said anything from the time that the boys were in the Shippee's driveway until Eric was struck by the train; **(Exhibit A,**

**15:10-15:12)** that Eric could not have seen an approaching train because of the trees bordering the tracks; **(RSUF ¶ 5, Exhibit A, 35:2-35:12)** that those trees had subsequently been cut down by railroad workers; **(Exhibit A, 23:16-29:3)** that Eric was blindsided by the train; and, that Shippee's observations of Eric approaching and stepping onto the tracks indicated to Shippee that Eric was surprised by the oncoming Amtrak train and unaware of its proximity to the crossing. **(RSUF ¶¶ 10, 11, 12)**

Furthermore, Mr. Shippee testified that he (Shippee) did not see the train until he was on, or across the tracks; **(RSUF ¶¶ 5, 15)** that he (Shippee) did not realize that the train was approaching, or going fast, until after he had already gotten across the tracks; **(RSUF ¶¶ 5, 15)** and, that he (Shippee) was not hurrying because of a fast approaching train, because he was not aware that the train was so close, or moving so fast until after he was already on, or across the tracks. **(RSUF ¶¶ 5, 15)** This evidence raises a genuine issue of material fact with respect to whether or not Eric Pratt was aware of the presence of the train prior to being struck.

Defendant alleges that Mr. Pratt "heard the sound of a train horn as the train approached the crossing from the south." The fact that Mr. Shippee said the words "beat the train," proves nothing about whether or not Eric Pratt heard the statement given the fact that Mr. Shippee testified that he did not know what Eric heard, or intended as they left his driveway prior to the collision. **(RSUF ¶¶ 10, 11, 12, 14)**. The affidavit does not state that Shippee observed anything. Rather it simply makes a conclusory statement that Eric heard it despite the fact that Mr. Shippee testified to the contrary. **(Exhibit A, 13:20-14:6; 15:1-15:12)** This evidence raises a genuine disputes of material fact with respect to whether or not Eric Pratt was aware of the presence of the train prior to being struck.

It is also far from undisputed that Eric never looked up from the time he left Mr. Shippee's driveway until the time he was struck by the train. Defendants claim this is undisputed based on the testimony of the conductor as to his observations; however, objective and independent witness testimony disputes this account. **(See Defendants Exhibit 5, Amtrak Train Recording; Exhibit 2, Vernon Police Department Report containing statement of Kyle Shippee; Exhibit A, 50:17-51:21)**. This evidence raises a genuine issue of material fact with respect to whether or not Eric Pratt looked prior to being struck by the train.

> **2. The only reliable evidence regarding the train horn, the objective statements and testimony of non-party witnesses, is that the horn was either not sounded at all prior to the train striking and killing Eric Pratt, or was faint or muffled.**

Substantial evidence exists that creates a genuine dispute of material fact as to whether the horn was properly sounded, or not sounded at all for the majority of the approach to the subject crossing. Michelle Penza, a woman who was visiting her father at his home on Bemis Road, was just a few feet from the tracks throughout the Amtrak train's approach to the crossing and its collision with Eric Pratt. **(SAUF ¶ 14)** Ms. Penza reported in her statement to the law enforcement officers that investigated the incident that the train did not sound its horn during its approach to the crossing. **(SAUF ¶ 15)** Ms. Penza also testified at her deposition that the train did not sound its horn during its approach to or passage to the crossing. **(SAUF ¶ 15)** Ms. Penza drove up to the crossing and stopped just in time to see the train which almost hit her vehicle. **(SAUF ¶ 14)** Ms. Penza did not hear a horn until after Eric Pratt was struck by the train. **(SAUF ¶ 15)** Ms. Ms. Penza was surprised by the train as it was just a few seconds away from her at the clump of three (3) trees when she first noticed it. **(SAUF ¶ 16)** Ms. Penza's father timed a 50 mph Amtrak train after the collision, and found it took 3 seconds to travel from the tree clump to the intersection. **(SAUF ¶ 17)**

Witness Suzanne King was operating her motor vehicle northbound on route 142 parallel to the railroad tracks, closely approaching the Bemis Road crossing. **(SAUF ¶ 18)** Ms. King observed the boys walking, and not doing anything out of the ordinary. **(SAUF ¶ 19)** She saw the train approach from the south. **(SAUF ¶ 20)** Ms. King did not hear a train horn before the collision. **(SAUF ¶ 21)** In fact, she was startled at the speed of the train as it whizzed by her vehicle. **(SAUF ¶ 22)**

Kyle Shippee, despite what was stated in the attorney authored affidavit that was obtained from him, subsequently testified in his deposition that he heard a train horn that sounded far away when he was in his driveway. **(SAUF ¶¶ 1, 2)** Mr. Shippee testified that he did not hear the horn again until approximately two seconds before Eric was struck by the train. **(SAUF ¶ 5)** Furthermore, Mr. Shippee testified that he does not remember the lights on the front of the train being illuminated and that the bell on the train was not sounding as it approached the crossing and struck Eric Pratt. **(Exhibit A, 77:11-77:15; 78:7)** The fact that Ms. Penza did not hear a horn in her vehicle with the windows up, combined with Mr. Shippee's testimony of a horn that sounded far away, certainly supports the proposition that the horn, if sounded at all, was muffled. This evidence creates a genuine issue of material fact with regard to the sounding, or appropriate sounding of the horn.

### 3. Defendants' electronic evidence regarding the train's horn is unreliable, highly suspect and itself raises genuine disputes of material fact that preclude a grant of summary judgment.

Defendants supposed evidence of horn activation noted on the train's event data recorder is of no weight given the fact that, after the filing of Defendants motion, a second version of the event data recorder was produced that is different from the version upon which Defendants rely to support their motion. **(RSUF ¶¶ 25-28)**

Including the onboard video recording, Defendants have provided 3 different recorded versions of the events leading up to the collision, two event data recorder printouts and a video recording. **(SAUF ¶ 23)**. The video recording does not match up with the printout from the train's event recorder, the video. **(SAUF ¶ 24)** The event recorders show the horn continuing after Pratt is struck by the train. **(SAUF ¶ 25)** In the video, the horn stops immediately when Pratt is struck by the train. **(SAUF ¶ 26)**.

After the collision, the event recorder was not removed from the train involved, Amtrak Locomotive #108. **(SAUF ¶ 27)** The data was downloaded by a computer cord attached to the event recorder and a laptop computer. **(SAUF ¶ 28)** Then the raw data from the laptop was loaded using a computer program that reads the data. **(SAUF ¶ 29)** The speed and distance data is dependent on the diameter of the wheel on the locomotive, which is manually entered. **(SAUF ¶ 30)** There is no way to protect against tampering with the data or putting in different wheel sizes for different printouts.

Amtrak uses a form for the chain of custody of the event recorder data. **(SAUF ¶ 31)** There is a chain of custody form for the video data downloaded from the digital video recorder onboard the train at the time of the collision. **(SAUF ¶ 32)** Amtrak does not have a chain of custody form for the event recorder download of this incident. **(SAUF ¶ 33)** The chain of custody for the event recorder data in this case, has not and cannot now be proven without the form. **(SAUF ¶ 35)**

In short, no one really knows where the event recorder data has been. **(SAUF ¶ 36)** No one really knows whether the event recorder data has been altered. **(SAUF ¶ 37)** In fact, there is no way of knowing whether the data produced even came from the event recorder on the locomotive that was involved in the collision. **(SAUF ¶ 38)**.

The discovery of Defendants' earlier event data printout that was not produced in written discovery is alarming and fully disputes the printout that they rely on as support for their motion. Defendants first produced an event data recorder "printout" in response to a discovery request under sworn signature with a print date of February 27, 2012 and a wheel diameter entry of 37.5. **(SAUF ¶ 39)** This is the version Defendants rely on to support their motion. A second event data recorder "printout" was produced by Amtrak corporate representative Mr. Harald Keuerleber, when he appeared for deposition as Defendant Amtrak's 30(b)(6) witness. **(SAUF ¶ 40)**. Counsel for Amtrak initially tried to withhold this document as privileged.

This second event data recorder "printout", produced by Mr. Keuerleber, was printed closer to the date of the collision on February 1, 2012 and had a wheel diameter of 41". **(SAUF ¶ 42)** Changing the wheel diameter entered into the program will change the speed of the train. **(SAUF ¶ 43)**

One item of data that is not dependent on the diameter of the wheel but is recorded in actual time and in tenth's 1/10 of a second is the horn. **(SAUF ¶ 45)** This is a key piece of evidence in this case and the data is inconsistent from **Exhibit C** and **Exhibit G**. An examination of Keuerleber Deposition **Exhibit G** under the heading horn and **Exhibit C** reveals the inconsistency.

According to Defendant Amtrak's corporate representative, the train struck Eric Pratt somewhere between the times of 16:00:54 and 16:00:55 on the printouts. **(SAUF ¶ 60)** However, the two printouts have inconsistent records of horn sounding at the indicated time of 16:00:54. **(SAUF ¶ 46)** At the time of 16:00:54, **Exhibit G** recorded that the horn of locomotive 108 activated at .7 and .8, while **Exhibit C** recorded the horn of locomotive 108 activated at .8 and .9. **(SAUF ¶ 47)** A close examination of the printouts reveals several similar inconsistencies.

Perhaps more troubling is that, at the time of 16:00:49 **Exhibit G** shows horn activation on at what should be .6, .5, .4 and .3, but the number 1's indicating activation do not line up properly on the printout. Throughout this section it appears as if they could have been cut and pasted into place, then photocopied. The print on the rest of the page is superb. There is no reasonable explanation for an odd wavy pattern of 1's in this critical spot in time. **Exhibit C**, printed almost a month earlier does not show the same signs of what seems like alteration after the fact and has all the 1's lined up perfectly in this critical area. There should not be any difference between the two alleged printouts from the same event recorder data. **(SAUF ¶ 51)** Amtrak has no explanation for this difference. **(SAUF ¶ 52)**.

Finally, at 16:00:55, Keuerleber deposition Exhibit 7 indicates a train speed of 54 mph. **(SAUF ¶ 53)** Yet, at that same time, Keuerleber deposition Exhibit 2 indicates a train speed of 50 mph. **(SAUF ¶ 54)** Ultimately, Defendant Amtrak's corporate representative indicated that neither could be relied upon and that he was unable to verify the accuracy, or whether there was any alteration of the original data because the railroad could not locate the chain of custody form that should have been completed for the data. **(SAUF ¶¶ 33- 38)** A simple review of the documents and testimony reveals that the inconsistency and suspect nature of the data goes on and on calling into question the validity of any of the event recorder data to such an extent that any fact statement related to that data raises a genuine dispute of material fact that precludes a grant of summary judgment.

    **4.**    **The opinions of plaintiff's train operations expert Jim Scott have no bearing on the issues raised in Defendants' motion.**

Plaintiff's expert witness, Jim Scott, submitted his report on November 25, 2014. Mr. Scott's deposition was taken by Defendants on February 5, 2015. Both of these dates preceded the production of Defendants' second event data recorder print out disputing the print out that

defendant had produced in discovery and that Mr. Scott reviewed in preparation for his report and deposition in this case. Regardless of what Mr. Scott opined in reliance on the information originally produced in discovery by defendants, it cannot support Defendants' motion for summary judgment since Defendants have now admitted through their corporate representative that this very same data is unreliable. Therefore, any opinions and analysis based on the unreliable data which Defendants originally claimed to be "undisputed fact" can never support a grant of summary judgment which requires there to be no genuine disputes as to material facts. Any other conclusion would reward Defendants for their own suspect behavior during the course of discovery.

In short, the vast majority of facts upon which Defendants base their request for summary judgment have now been disputed after defendants had already filed the motion. Since the filing of the motion, the troubling circumstances of Mr. Shippee's affidavit and the even more troubling discovery of the alternate event recorder printout with different data have come to light and raised disputes about the entire factual basis for Defendants' motion. Genuine disputes of material fact are in abundance with the revelation of this new evidence and summary judgment at this point should not even be considered and perhaps would not have even been filed had this evidence come to light prior to the filing deadline. For all of these reasons, Defendants' motion should be denied.

> **5. The train crew had a duty to keep a careful lookout, to provide an adequate warning (horn signal) and to slow or stop the train if necessary to avoid striking and killing Eric Pratt.**

To the extent that Defendants deny any duties to keep a careful account, provided adequate warning, or to slow or stop the train if necessary to avoid a collision based on their claim that the subject crossing is "private," their motion should be summarily denied because they have offered no legible or admissible evidence to prove that Bemis Road was an "private"

road at the time the collision. This being the basic premise necessary to support many of Defendants' arguments, their failure must necessarily mean failure for Defendants' motion and the motion should be denied.

However, regardless of the status of the roadway, Defendants have admitted the existence of all the duties necessary to support the claims that Plaintiff has made in this case. Mr. Harald Keuerleber, the Amtrak 30(b)(6) witness that was designated to answer questions on rules of operation for the crew testified on these very issues. According to Defendant Amtrak, the engineer and conductor had a duty to keep a careful lookout for Eric Pratt as they drove the train down the tracks. **(SAUF ¶ 55)** The train crew also had a responsibility to warn Eric Pratt as he approached the railroad crossing. **(SAUF ¶ 56)** The crew had a duty to slow the train down if Eric Pratt was not responding to the warning. **(SAUF ¶ 57)** Ultimately, the crew had a duty to put the train in emergency if necessary to slow down when it was evident that the warning had not registered with Eric Pratt. **(SAUF ¶ 58)** When dealing with human life it is better to err on the side of caution when making that decision. **(SAUF ¶ 59)**

The speed that Eric Pratt was walking toward the crossing is a factor that the crew should have considered when deciding whether or not he received a warning and was going to stop. **(SAUF ¶ 63)** The fact that Eric was walking casually is a factor that the crew should have considered when deciding whether or not he received a warning and was going to stop. **(SAUF ¶ 64)** Whether the crew ever saw Eric look in the direction of the train is a factor that they should have considered when deciding whether or not he received a warning and was going to stop. **(SAUF ¶ 65)** Observing Eric walking towards tracks and not acknowledging the train by speeding up or looking at it weighed in favor of him not stopping. **(SAUF ¶ 66)** This is exactly what is shown on the onboard video of the incident. **(Defendants' Exhibit 5, Amtrak Video**

**Recording**). The video shows Pratt walking casually towards the tracks and never acknowledging or looking in the direction of the train in the portion of the video where he can be seen. Id. Even though this should have weighed in favor of him not having received a warning and not intending to stop, the train was never slowed and the brakes on the train were not engaged until the train had already struck and killed him. **(SAUF ¶ 60)**

According to Defendant Amtrak, deciding to apply the brakes after Eric Pratt had already been hit was the wrong time for the engineer to make the decision. **(SAUF ¶ 61)** According to Amtrak, this is the type of conduct that may well result in disciplinary action. **(SAUF ¶ 62)** Finally, if the sight lines were as clear as Defendants' claim (something Plaintiff disputes), then the crew should have had ample time to observe Pratt's behavior and at least engage the brakes before striking him. Even a fraction of a second would have made a difference. Pratt attempted to dive out of the path of the train at the last instant as shown in the video, so any slow down or braking would have made a difference. All of this evidence contradicts the testimony of the train crew that they were keeping a careful lookout and is sufficient to support a claim that the crew acted unreasonably under the circumstances when they failed to slow, or even attempt to slow the train until after they had already struck and killed Eric Pratt. Therefore, Defendants' motion for summary judgment regarding the duties of Amtrak and the train crew should be denied.

**B.** **Plaintiff's claims regarding the train horn are not preempted by federal law.**

Preemption analysis under the Federal Railroad Safety Act (FRSA) requires a two-step process. First, it must be determined whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation. If so, the plaintiff's claim avoids preemption. Otherwise, the second step determines whether any federal

regulation covers the plaintiff's claim. If a regulation covers the plaintiff's claim, it "substantially subsumes the subject matter" of that claim and the claim is preempted. Zimmerman v. Norfolk Southern Corp., 706 F.3d 170 (3d Cir. 2013), cert. denied, 2013 WL 2903502 (U.S. 2013), citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993) (noting that the regulation must do more than "touch upon or relate to [the] subject matter").

The defendant in this case has not provided this Court with any federal regulation that covers the plaintiff's claim in this case in that the federal regulations do not subsume railroad operations through private railroad crossings. Therefore, even assuming this crossing is a private railroad crossing, the characterization of the private railroad crossing takes it outside of the federal regulations concerning train operations. If it is a public crossing then Plaintiff's allegations that the Defendant Railroad violated the standard of care with respect to sounding the horn in this case are not preempted. On the other hand, if the subject crossing is a private railroad crossing then there is no federal regulation set forth by the Defendants in their motion can be characterized as substantially subsuming the subject matter involved in Plaintiff's claim in this case.

The Defendant relies on a case decided in in 1926 styled Napier v. Atlantic Coast Line R.R. for the proposition that the Plaintiff's horn claims in this case are preempted. Defendant's Motion for Summary Judgment, Document 87-1 page 14. Defendants fail to establish to any degree how federal regulations concerning the type of locomotive equipment required by the regulations have anything to do with the way that equipment is to be operated at a private crossing. The cases set forth by the Defendant do not involve the operation of a train and instead involved allegations by the plaintiff that were directed at the type of equipment on the locomotives. See Napier, 272 U.S. 605, (1926); Kurns v. R.R. Friction Prods. Corp., 132 S. Ct.

1261, 1267 (2012). Defendant's reliance on Kurns is further misplaced in that Kurns involved allegations concerning the design of a locomotive that used asbestos as part of the materials. Kurns, 132 S. Ct. 1261 (2012).

In this case, there is no federal regulation that even touches on Plaintiff's claim if the crossing is private, therefore there is nothing to support a finding of preemption for the Defendant railroad in this case. However, the Defendant railroad acknowledges on page 14 of its motion that there are still common law duties that apply, yet it addresses its common law duty through statements of fact that are controverted. In other words, the Defendant railroad has stated that it properly met any applicable common law duty by sounding its horn, ringing its bells and having its headlights illuminated. See Defendants' Motion for Summary Judgment, Document 87-1 at page 14. Defendant's version of how, when and if the horn was sounded in this case are not undisputed facts for purposes of determining Defendants' Motion for Summary Judgment as set forth extensively above.

There is nothing set forth by the Defendants to establish to any degree that the federal government substantially subsumes locomotive operation through private crossings. Furthermore, the allegations in this case with respect to the sounding of the horn do not even seek to place more of a burden on the railroad operation than what is already set forth by the federal government as applied to public crossings. If the state of Vermont wanted to shut the private crossing down all together it could do so without running afoul of the federal preemption doctrine. In Island Park, LLC v. CSX Transp., the state's decision to terminate a property owner's use of **private** rail crossing was not preempted by federal law. Island Park, LLC, 559 F.3d 96 (2nd Cir. 2009) (emphasis added).

The party seeking to overcome the presumption under the Supremacy Clause that state and local regulation of health and safety matters can constitutionally coexist with federal regulation bears a heavy burden. U.S.C.A. Const. Art. 6, cl. 2. In re Vermont Ry., 171 Vt. 496, 769 A.2d 648 (2000). In this case, the defendant has not met its burden in showing which federal regulations substantially subsumes locomotive operations through private crossings. In fact, it admits that such federal regulations do not exist, and further fails to direct this Court's attention to any case preempting a claim wherein it was alleged that a horn was not properly sounded, as opposed to those cases where the type of horn used was the basis of the plaintiff's claim.

Plaintiff's claims with respect to if or how the locomotive's horn was sounded or maintained in this case are not preempted by federal law because the regulations that do exist with respect to public crossings were violated in this case, and because no such federal regulations subsume the subject matter of locomotives sounding their horns when approaching private crossings. The railroads own rules indicate that when in doubt they should take the safe route, and that it has admitted in its testimony that it has a duty to keep a careful lookout, which leads to the obvious inference that the operators have a duty to act when they notice or should notice anything dangerous to themselves, their locomotive, or the general public whether it is at a private or public crossing.

### C. Just as the crew owed a duty of reasonable care to provide a warning, Defendant Amtrak owed the same duty to exercise reasonable care as its crew.

This request for summary judgment must also fail for all the foregoing reasons and for the reason that the premise that is based on, that crossing question is "private", has never adequately been established in this case and cannot be supported by the illegible and inadmissible evidence Defendants cite in their motion. In other words, if a the claim that the

crew acted unreasonably in failing to exercise the foregoing duties is a viable claim, then a claim that Defendant Amtrak was negligent for not requiring them to use such reasonable care is also a viable claim. Therefore, summary judgment on this basis must be denied.

> **D.     Claims against Defendant Amtrak that Plaintiff does not intend to submit to the jury.**

Plaintiff does not intend to submit the claim that Amtrak was negligent in failing to evaluate the dangers of the Crossing and failing to provide additional protection because the crossing was ultra-hazardous. Plaintiff does not intend to submit the claim that Defendant Amtrak hired and retained a crew that it knew or should have known was not competent.

> **E.     With respect to Defendant NECR, the only claim that Plaintiff intends to submit to the jury is the claim that NECR was negligent in maintaining the vegetation at the Crossing.**

Sufficient evidence exists to support the claim that NECR was negligent in maintaining the vegetation at the Crossing. Eyewitnesses Kyle Shippee and Michelle Penza testified that the view of a train is obstructed by the vegetation surrounding the crossing **(Exhibit A, 23:16-29:3; Exhibit F, 47:2-47:12)**. Defendants' expert witness Foster Peterson testified in his deposition that the first moment the train would be visible to Eric Pratt was only six seconds before he was struck and killed by the train. **(RSUF ¶ 72, Exhibit D)** At that moment, the train would be only 430 feet from the crossing and, depending on which event recorder printout is consulted, moving at a speed of 50-54mph. **(RSUF ¶ 72, Exhibit D; SAUF ¶¶ 53-54)** Moreover, the railroad at a minimum had notice of this condition evidenced by Mr. Shippee's testimony that after Eric was killed, the railroad came out and cut down the trees that obstructed the view of an oncoming train. **(Exhibit A, 23:16-29:3)** The foregoing issue raises a sufficient factual dispute that summary judgment should be denied.

Conclusion

For the foregoing reasons, Plaintiff respectfully requests the Court enter an order denying Defendants' Motion for Summary and for such further relief as the Court may deem just and proper under the circumstances.

    MICHAEL J. PRATT, by his attorneys

    BEHRENS VENMAN PLLC

    /s/ Robert S. Behrens
Robert S. Behrens (VT State Bar #2840)
11 Kilburn Street, Suite 216
Burlington VT 05401
(802) 658-5900 (telephone)
(802) 658-5222 (facsimile)
rsb@behrensvenmanlawvt.com

SULLIVAN LAW LLC
Robert C. Sullivan
1600 Baltimore, Suite 200
Kansas City MO 64108
(816) 221-9922 (telephone)
(816) 817-1962 (facsimile)
rsullivan@sullivantrial.com
*Admitted Pro Hac Vice*

ATTORNEYS FOR PLAINTIFF

### NOTICE OF SERVICE

The undersigned attorney for Plaintiff certifies that on October 20, 2015, I caused Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment to be served through the Court's CM/ECF system on Robert B. Hemley, rhemley@gravelshea.com and Navah C. Spero nspero@gravelshea.com, Attorneys for Defendants.

    /s/ Robert S. Behrens
Attorney for Plaintiff