## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| MICHAEL J. PRATT, Administrator | ) | |
| of the Estate of Eric J. Pratt, Deceased, | ) | |
| | ) | |
|     Plaintiff | ) | |
| | ) | Case No. 2:13-cv-00197 |
|     v. | ) | |
| | ) | |
| NATIONAL RAILROAD PASSENGER | ) | |
| CORPORATION, d/b/a AMTRAK; | ) | |
| NEW ENGLAND CENTRAL RAILROAD, INC., | ) | |
| MICHAEL E. KUJALA AND WILLIAM C. RAE, | ) | |
| | ) | |
|     Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## STATEMENT OF UNDISPUTED FACTS

### AND

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Plaintiff, by and through his counsel of record, for his Response to Defendants'

Statement of Undisputed Facts, states as follows:

1.      On January 15, 2012, decedent Eric J. Pratt ("Decedent" or "Mr. Pratt") then age

15 and his friend, Kyle Shippee ("Mr. Shippee"), left Mr. Shippee's house to walk to Mr. Pratt's

house.  Am. Compl. And Demand for Trial by Jury ("Am. Complaint") ¶ 7; Typed Affidavit of

Kyle Shippee, ¶ 4-5, July 10, 2014 (Exhibit 1).

**RESPONSE:  Admitted.**

2.      Mr. Pratt's house was located on Bemis Road, on the west side of the train track

owned by New England Central Railroad, Inc. ("NECR").  Vermont State Police Investigation

Report, Amtrak 0070 (Exhibit 2); Pl.'s Resp. to Amtrak's First Set of Int. and Req. to Produce, ¶

1(c) (Exhibit 3), December 13, 2013.

**RESPONSE:  Admitted.**

3.      As the boys left Mr. Shippee's house, Amtrak train 54 travelling from Washington, D.C. to St. Albans, Vermont (the "Train"), approached the Bemis Road crossing in Vernon, Vermont (the "Crossing").  Exhibit 2 at Amtrak 0070; Handwritten Statement of Kyle Shippee, July 10, 2014 (Exhibit 4).

> **RESPONSE:  Objection.  This statement is vague with respect to "approached".  Without waiving the objection, Plaintiff admits the train had not reached the crossing when the boys left Shippee's.**

4.      Both boys were aware of the Train's approach and decided to "beat the train." Exhibit 1 at ¶ 6.

> **RESPONSE:  Disputed. There is no evidence of Eric's intentions of what Eric Pratt "decided" to do.  Mr. Shippee testified that he did not know what, if anything, Eric Pratt saw, heard, or intended prior to being struck by the train. Def. Exhibit 1 at ¶ 6. See Shippee Deposition, 15:1-15:12; 24:14-27:1; 57:10-58:8 (Exhibit A).**

5.      Mr. Shippee realized that the Train was approaching the Crossing more quickly than anticipated and ran to cross the tracks.  *Id.*

> **RESPONSE:  Disputed.  See Shippee Deposition 57:10-58:8 (Exhibit A); Shippee handwritten statement attached as Exhibit B.**

6.      Mr. Pratt was walking with his head down and did not look up to check on the Train's position before stepping on the tracks.  *Id.*

> **RESPONSE:  Disputed.  See Amtrak Video Recording, previously submitted as Exhibit 5 to Defendants' Statement of Undisputed Facts and filed under seal. See Shippee deposition 68:22-69:1, wherein Mr. Shippee testifies that he would have no way of knowing what Eric saw with respect to the train (Exhibit A).**

7.      He did not change his pace to avoid the Train, and Mr. Pratt walked right in front of the Train as it occupied the crossing, killing him.  *Id.*; Exhibit 2 at Amtrak 0069.

> **RESPONSE:  Admitted in part.  Admitted that Eric Pratt stepped onto the tracks. In all other respects, disputed.  See Amtrak Video Recording showing Eric Pratt attempting to avoid being hit at the last moment.  See Amtrak Video Recording**

**showing Mr. Shippee cross the tracks and only turn to Eric Pratt's direction in the last few seconds. Therefore, he could not have seen what Eric Pratt did in his entire approach to the crossing. See Amtrak Video Recording, previously submitted as Exhibit 5 to Defendants' Statement of Undisputed Facts and filed under seal. Admit Eric stepped onto the tracks.**

<u>Details of the Accident</u>

8.     At approximately 5:00 p.m. on January 15, 2012, Mr. Shippee and Mr. Pratt went to Mr. Shippee's house to retrieve a video game and left there shortly thereafter to return to Mr. Pratt's house. Exhibit 1 at ¶ 4; Exhibit 2 at Amtrak 0073.

**RESPONSE:  Admitted.**

9.     Mr. Shippee's house is located on Fort Bridgeman Road in Vernon, Vermont, which is also Vermont Route 142, parallel to the NECR tracks and approximately 50 yards south of Bemis Road on the east side of the Crossing. Exhibit 1 at ¶ 2.

**RESPONSE:  Admitted in part that Mr. Shippee's house is located on Fort Bridgeman Road in Vernon, Vermont, which is also Vermont Route 142, parallel to the NECR tracks. In all other respects disputed because the remaining facts are not supported by the evidence cited.**

10.     Shortly after leaving Mr. Shippee's house, Mr. Shippee and Mr. Pratt heard a train horn and Mr. Shippee said to Mr. Pratt that they should "run and beat the Train." Exhibit 4.

**RESPONSE:  Admitted in part.  Admitted that Shippee testified that he heard the train horn that he thought was far away and said "run and beat the Train." Disputed that Mr. Pratt heard anything and in all other respects.  Insufficient information.  See Shippee Deposition, 15:1-15:12; 24:14-27:1; 57:10-58:8 (<u>Exhibit A</u>).**

11.     Mr. Shippee observed that Mr. Pratt heard what Mr. Shippee said about beating the Train. Exhibit 1 at ¶ 6.

**RESPONSE:  Disputed.  Not supported by cite.  Affidavit does not state that Shippee observed anything.  Rather makes conclusory statement that Eric heard it. See Shippee deposition, 13:20-14:6; 15:1-15:12 (<u>Exhibit A</u>).**

12. The boys wanted to cross the track ahead of the approaching train because during the previous week, a number of freight trains had stopped on the tracks just north of Bemis Road, blocking the Bemis Road crossing for an extended period of time. Exhibit 1 at ¶ 6.

RESPONSE:

**Disputed. Mr. Shippee testified that with respect to what Eric "wanted" that Mr. Shippee did not know what, if anything, Eric Pratt saw, heard, or intended prior to being struck by the train and what he stated was assumption and/or a guess. Def. Exhibit 1 at ¶ 6. See Shippee deposition, 15:1-15:12; 24:14-27:1; 57:10-58:8 (<u>Exhibit A</u>).**

13. Mr. Shippee and Mr. Pratt crossed Route 142 and approached the Crossing's railroad tracks. Exhibit 1 at ¶ 5.

**<u>RESPONSE:</u> Admitted.**

14. Mr. Shippee observed Mr. Pratt look toward the oncoming Train while they were on Bemis Road approaching the railroad tracks. *Id.* ¶ 6.

**<u>RESPONSE:</u> Disputed. The Amtrak Video Recording shows that Mr. Shippee could not have seen what Mr. Pratt did while on Bemis Road. See Amtrak Video Recording, Exhibit 5 to Defendants' Statement of Undisputed Facts and filed under seal; see Shippee deposition 57:10-58:8 (<u>Exhibit A</u>); see Shippee handwritten statement attached as <u>Exhibit B</u>.**

15. Mr. Shippee ran to cross the track because the Train approached more quickly than he anticipated, but Mr. Pratt did not run. *Id.* at ¶ 6; January 15, 2012 Amtrak Video Recording at 4:25-4:32 (Exhibit 5).

**<u>RESPONSE:</u> Admitted in part. Admitted that Eric Pratt did not run. Admitted that Shippee did run, but disputed that it was because the train approached more quickly than he anticipated. Mr. Shippee did not see the train until he was on or across the tracks and that is the point where he observed that the train was moving fast. See Shippee deposition 35:11-37:2; 57:10-58:8 (<u>Exhibit A</u>).**

16. Mr. Pratt trailed Mr. Shippee and as he approached the track, he did not stop or look for the Train he knew to be approaching. *Id.* at 4:25-4:32.

**RESPONSE**: Admitted in part. Admitted that the cited portion of the Amtrak Video Recording shows Eric Pratt approach the tracks later in time than Mr. Shippee if that is what is meant by "trailing." Admitted that the portion of the Amtrak Video Recording cited does not appear to show Eric Pratt stop. Disputed that the cited portion of the video can prove or disprove anything about whether the train was something that Eric Pratt "knew to be approaching." See Amtrak Video Recording, Exhibit 5 to Defendants' Statement of Undisputed Facts and filed under seal; see Shippee handwritten statement (**Exhibit B**).

17.     Mr. Pratt walked right in front of the Train as it travelled through the Crossing, killing him instantly. Exhibit 2 at Amtrak 0069; Exhibit 5 at 4:25-4:32.

**RESPONSE**:  Admitted that Eric Pratt stepped onto the tracks and was struck by the train. Plaintiff is without sufficient information to admit or dispute whether or not Eric died instantly. In addition, the plain language of the evidence cited does not adequately support the statement of facts.

18.     According to Mr. Shippee, both he and Mr. Pratt expected the Train to be a slow-moving freight train preparing to stop, not a passenger train travelling at full speed. Exhibit 1 at ¶ 6.

**RESPONSE**:  Disputed.  See Shippee deposition 30:6-31:24 (**Exhibit A**).

19.     The Train was travelling approximately 50 miles per hour immediately before the accident. Dep. of James Scott 136:25-137:4, Feb. 5, 2015 (Exhibit 6).

**RESPONSE**:  Disputed.  See **Exhibit C** (Keuerleber Deposition Exhibit 7), produced by Defendant's corporate representative at his 30(b)(6) deposition showing a speed of 54 mph for the train immediately before Eric was struck and killed by the train.

20.     This is below the 55 miles per hour maximum authorized speed for passenger trains for that section of track.  *Id.* at 137:5-13.

**RESPONSE**:  Disputed.  Plaintiff is unable to admit this statement because the premise is based on a 50 mph speed which has not been proven to be accurate.  See **Exhibit C** (Keuerleber Deposition Exhibit 7) showing a 54 mph speed.

21.     Freight trains have a maximum authorized speed of 40 miles per hour at this

section of track.  New England Central Railroad, Timetable No. 9, Amtrak 0196, June 20, 2010

(Exhibit 7).

**RESPONSE:  Admit that the referenced document so states.**

22.     The train horn has five flutes, three facing forward and two facing the rear.

Exhibit 6 at 64:15-20.

**RESPONSE:  Admitted.**

The Event Recorder

23.     The lead locomotive on the Train was equipped with an event recorder, as

required by federal regulations.  Expert Report of Full Service Railroad Consulting, Inc., 3,

February 26, 2015 (Exhibit 8).

**RESPONSE:  Admitted.**

24.     The event recorder accurately recorded various data from the Train, including its

speed, distance travelled, the sounding of its horn and bells and the application of its emergency

break.  Exhibit 6 at 56:9-57:14; Event Recorder Data Table at Amtrak 0001-0008 (Exhibit 9).

**RESPONSE:  Disputed with respect to "accurately."  The testimony cited does not
address accuracy.  See <u>Exhibit C</u> (Keuerleber Deposition Exhibit 7) showing a 54
mph speed.**

25.     An analysis of the event recorder demonstrates that:

a.      the engineer applied the emergency break within moments of impact as

        the Train went through the Crossing, Dep. of Foster Peterson 41:19-42:15

        (Exhibit 10);

b.      the event recorder reflects that the emergency brake was first suppressed

        at 16:00:54, Exhibit 9 at 0003;

c.      The Train's horn sounded during 21 of the 30 seconds preceding the

accident, Exhibit 9 at Amtrak 002-0004;

d.      The Train's horn sounded continuously for the seven seconds immediately

prior to the accident, *id.*;

e.      The Train's bell sounded for all 25 seconds preceding the accident, *id.*

RESPONSE:

**a.      Disputed.  The cited testimony says at point of impact, not within moments.  See deposition of Foster Peterson 41:19-42:15 (Exhibit D). At the time of impact, the brakes on the train were not engaged. See deposition of Harald Keuerleber 99:6-99:16; 121:23-122:2 (Exhibit E).**

**b.      Disputed.  The emergency brake was not engaged at the time of impact.  See deposition of Harald Keuerleber, 99:6-99:16; 121:23-122:2 (Exhibit E).**

**c.      Admitted in part. Admitted that the cited exhibit has "1"s in the horn column for 21 of 30 seconds preceding collision.  Disputed that the horn actually sounded and in all other respects.  See deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (Exhibit F); see deposition of Kyle Shippee 21:25-22:24 (Exhibit A).**

**d.      Disputed.  Admitted that the cited exhibit has "1"s in the horn column for 7 seconds preceding collision.  Disputed that the horn actually sounded and in all other respects.  See Deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (Exhibit F); see deposition of Kyle Shippee, 21:25-22:24 (Exhibit A).**

**e.      Disputed.  See deposition of Kyle Shippee 77:11-77:15; 78:7 (Exhibit A).**

26.     Based on the Event Recorder and the observations of NECR employees present at

the scene the morning after the accident, the front of the Train came to a stop approximately 908

feet after the Bemis Road crossing.  Exhibit 10 at 41:8-18; Exhibit 9 at Amtrak 0003.

**RESPONSE:  Disputed.  Exhibit 10 is testimony of a defense expert, not NECR employees.  Exhibit 9 has no specific entry showing 908 feet and is unreliable based on the Defendant's production of a second version of the same data which cannot be**

**reconciled with Exhibit 9. See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (<u>Exhibit E</u>).**

The Video Recording

27.     The Train was equipped with a video camera mounted inside the cab, on the top, center portion of the windshield. Exhibit 2 at Amtrak 0074; Exhibit 6 at 63:17-20.

> **<u>RESPONSE:</u> Admitted in part. Admitted that the camera was onboard. Disputed that the camera is located where described. See Deposition of Harald Keuerleber 125:25-126:6 (<u>Exhibit E</u>).**

28.     In the video recording captured by the Train's camera, the horn unambiguously sounds for twenty out of the thirty seconds prior to impact and continuously for the last seven seconds before impact. Exhibit 5 at 4:02-4:32.

> **<u>RESPONSE:</u> Disputed that the horn sounded as stated or heard on the video. See Deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (<u>Exhibit F</u>); see deposition of Kyle Shippee 21:25-22:24 (<u>Exhibit A</u>).**

29.     From the video it is clear that a pedestrian approaching the Crossing from Route 142 had a continuous line of sight for hundreds of feet and, if paying attention, could see a train approaching from the prior crossing for a total of fifteen seconds. *Id.* at 4:15-32; photograph of crossing line-of-sight (Exhibit 26).

> **<u>RESPONSE:</u> Disputed. See deposition of defense expert Foster Peterson 84:19-93:11 (<u>Exhibit D</u>). See deposition of Kyle Shippee 24:14-25:6; 25:15-25:21; 34:16-35:10 (<u>Exhibit A</u>).**

Observations of Witness Michelle Penza

30.     As the Train approached the Crossing, Michelle Penza was leaving her father's house, which was located adjacent to the NECR train tracks on the west side of the Crossing. Dep. of Penza 15:5-16:2, July 8, 2014 (Exhibit 11).

> **<u>RESPONSE:</u> Admitted in part. Admitted that Ms. Penza left her house and drove to the crossing prior to train's arrival. In all other respects disputed because the term "approached" as used in this statement is vague and ambiguous. Presumably**

8

**the train approached the crossing all day; therefore, what point in the approach that day that the Defendant is referring to is impossible to determine on the information given.**

31.     When she stopped at the Crossing, Ms. Penza thought she was so close to the tracks she would be hit by the Train but "was in such a panic that [she] wasn't capable of putting [her] car in reverse." *Id.* at 18:7-18.

**RESPONSE:  Admitted that she so testified.**

32.     Ms. Penza had the heater on and had the radio turned on, most likely to country western music. *Id.* at 13:11-14:2.

**RESPONSE:  Admitted that she so testified.**

33.     Ms. Penza did not hear the horn as the Train approached the Crossing. *Id.* at 30:9-11.

**RESPONSE:  Admitted that she so testified.**

<u>Observations of the Amtrak Crew</u>

34.     At the time of the accident, Mr. Rae was the engineer operating the lead locomotive on the Train, and Mr. Kujala was the Train's conductor. Exhibit 2 at 0070.

**RESPONSE:  Admitted.**

35.     Mr. Rae has been an engineer for Amtrak since 2007. Dep. of Rae at 13:2-5, July 9, 2014 (Exhibit 12).

**RESPONSE:  Admitted.**

36.     To become an engineer, Mr. Rae successfully completed eight weeks of intensive course work and eighteen months of on the job training. *Id.* at 12:22-13:1. There is no evidence that he was not trained or qualified to perform that role.

**RESPONSE:  Admitted in part.  Admitted that Mr. Rae testified as to his training. Disputed as to the unsupported and procedurally improper statement that there is no evidence he was not trained or qualified to perform that role.**

37.     As he approached the Crossing on the day of the accident, Mr. Rae saw Mr. Shippee and Mr. Pratt as they approached the track, before Mr. Shippee ran across the track.  *Id.* at 26:24-27:1.

**RESPONSE:  Admitted that he so testified.**

38.     Mr. Rae saw a car on the west side of the Crossing, saw one boy cross in front of the Train and saw the other boy approaching the Crossing.  *Id.* at 20:10-17.

**RESPONSE:  Admitted that he so testified.**

39.     Mr. Rae was sounding the horn as Mr. Shippee crossed the track, moments before Mr. Pratt attempted to cross.  *Id.* at 28:12-14.

**RESPONSE:  Disputed.  See deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (Exhibit F); see deposition of Kyle Shippee 21:25-22:24 (Exhibit A).**

40.     Mr. Pratt continued at a steady pace and when Mr. Rae realized Mr. Pratt would not stop before stepping onto the train track or even look up, he put the Train in emergency, but it was too late.  *Id.* at 29:7-24, 30:13-14.

**RESPONSE:  Objection.  This request seeks the admission of multiple facts and is therefore improper and impossible to answer with either "admitted" or "disputed." It also seeks the admission of an opinion by asking to admit that something "was too late."  Subject to these objections, disputed that he put the train in emergency at any time prior to striking Eric Pratt. See deposition of Harald Keuerleber 99:6-99:16; 121:23-122:2 (Exhibit E).**

41.     Mr. Kujala has worked for Amtrak since 1989 and has been a  Conductor since approximately 1993.  Dep. of Kujala at 7:14-8:3, July 9, 2014 (Exhibit 13).

**RESPONSE:   Admitted.**

42.     There is no evidence that he was not qualified or trained to perform that role.

**RESPONSE:  Denied.  The statement is not supported by citation as required by Rule 56(c)(1)(A) and is therefore improper.**

43.     As the Train approached the Crossing, Mr. Kujala saw a car approaching Bemis Road from the west side of the track.  *Id.* at 23:10-15.

**RESPONSE:  Admitted that he so testified.**

44.     Mr. Kujala estimated that he saw Mr. Pratt and Mr. Shippee approximately ¼ mile prior to the Crossing on the east side of the track.  *Id.* at 25:9-20.

**RESPONSE:  Admitted that he so testified.**

45.     He also observed that Mr. Pratt was walking casually and never looked up, despite the fact the horn was blowing continuously  *Id.* at 23:16-20, 24:23-25:2; 36:24-37.3.

**RESPONSE:  Admitted in part.  Admit that Mr. Kujala testified that he observed Mr. Pratt walking casually and testified that he never looked up.  Disputed that the horn was blowing continuously because the cited testimony does not support the assertion of fact as required by Rule 56(c). See also deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (Exhibit F); see deposition of Kyle Shippee, 21:25-22:24 (Exhibit A).**

Plaintiff's Expert's Opinions

46.     Plaintiff has retained one expert, Jim C. Scott of Scott & Associates, Inc., an expert on train operations.  *See* Pl.'s Designation of Expert Witnesses, 2, December 1, 2014 (Exhibit 14) (without accompanying exhibits).

**RESPONSE:  Admitted.**

47.     Mr. Scott offers three opinions:  (1) although the engineer blew the Train's horn prior to the accident, it was not blown at the right time or in the right progression, which caused the accident; (2) a buildup of ice and snow in the three forward facing flutes caused the horn to sound muffled, which violated federal regulations and did not provide an adequate warning to

pedestrians; and (3) "The engineer was operating the train in throttle 8 (wide open)" and he

"never offered to reduce the throttle, thus, reducing speed of the train," nor did he "offer[…] any

type of braking prior to emergency brakes."  Report of Scott & Assoc., Inc., 6, November 25,

2014 (Exhibit 15).

> **RESPONSE:  Objection. The assertion is vague and ambiguous in that it is not possible to determine whether the assertion is that these are Mr. Scott's only opinions, or if these are three of many opinions. Subject to objection, admitted that these are three out of many of Mr. Scott's opinions.**

48.     According to Mr. Scott, the event recorder and video demonstrate that the Amtrak

Train sounded its horn as it approached the Crossing.  Exhibit 6 at 128:16-23, 157:23-25.

> **RESPONSE:  Admitted in part. Admitted that the version of the event recorder data shown to Mr. Scott indicates that the horn was activated and that there is the sound of a horn on the video. Disputed that the event recorder and video are accurate and in all other respects. See deposition of Michelle Penza 30:1-30:11; 34:3-34:16; 44:25-50:12 (Exhibit F); see deposition of Kyle Shippee 21:25-22:24 (Exhibit A); see deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (Exhibit E).**

49.     Mr. Scott initially opined that the horn was not blown during the 4.5 seconds

immediately prior to the accident, which included the moments the Train occupied the Crossing.

Exhibit 15 at 5.

> **RESPONSE:  Admitted in part. Admitted that Mr. Scott's report so stated prior to the discovery of Defendant's alternate event recorder download that does not match the download produced, and before Defendant's corporate representative testified that the event recorder printouts are not reliable. In all other respects, disputed. See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (Exhibit E).**

50.     Mr. Scott based this opinion on a statement in the police report, that the "train was

stopped approximately one tenth of a mile north of the Bemis road crossing."  *Id.* at 5; *see also*

Exhibit 2 at Amtrak 0072; Exhibit 6 at 141:19-142:17.

> **RESPONSE:  Admitted in part.  Admitted that Mr. Scott's report so stated prior to the discovery of Defendant's alternate event recorder download that does not match the download produced, and before Defendant's corporate representative testified**

**that the event recorder printouts are not reliable. In all other respects, disputed. See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (Exhibit E).**

51.    According to Mr. Scott, if the stopping distance for the Train was closer to 800 feet and not the 528 feet he used in his report, then the Train would have been blowing its horn both prior to reaching the Crossing, and as it occupied the Bemis Road crossing. Exhibit 6 at 139:3-140:2, 142:9-17.

**RESPONSE:  Disputed.  See Exhibit 6 to Defendant's Statement of Uncontroverted Facts 139:3-140:2, qualifying this statement as "based on the event recorder", which has since been determined to be unreliable.  See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (Exhibit E).**

52.    Mr. Scott did not speak to the state police offers who wrote the report to determine whether they measured the distance or approximated. Exhibit 6 at 140:3-10.

**RESPONSE:  Admitted.**

53.    The crossing directly after the Bemis Road Crossing is approximately 700 feet north beyond Bemis Road. Exhibit 8 at 6; Exhibit 6 at 82:24-83:1 (estimating that the subsequent crossing was at least 400-500 feet beyond Bemis Road).

**RESPONSE:  The cited evidence does not support the assertion as required by Rule 56(c); therefore, Plaintiff must respond that the assertion is disputed.  Exhibit 8 at 6 states "That private crossing is located more than 700 feet north…."**

54.    Based on the video, it is clear that the Train crossed the subsequent crossing and continued toward the box cars parked on the spur track running next to the main track. Exhibit 5 at 4:31-4:50.

**RESPONSE:  Admitted**

55.    According to the event recorder, the Train traveled 927 feet after the emergency brake was first engaged, which was immediately prior to the accident. Exhibit 8 at 6; Exhibit 10 at 41:6-22.

**RESPONSE:  Disputed. See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (Exhibit E).**

56.     Mr. Scott opined that at the time of accident, the horn was inadequate to warn pedestrians because a buildup of ice and snow in the three forward facing flutes caused a muffling of the horn.  Exhibit 15 at 5.

> **RESPONSE:  Admit that this is one of Mr. Scott's opinions.  To the extent that Defendant asserts that is the only reason opined by Mr. Scott that the horn was inadequate, disputed because the citation does not support such an assertion as required by Rule 56(c).**

57.     A review of the weather at each station the Train passed through reveals that on that entire route on January 15, 2012 although it was below freezing throughout the Train's journey, no frozen precipitation fell along the route at the time the Train was travelling through that area.  Weather Data Spreadsheet and supporting documents (Exhibit 16).

> **RESPONSE:  Admit that the referenced exhibit so indicates.**

<u>The Crew Had No Obligation To Sound The Horn</u>

58.     At all relevant times, the Bemis Road crossing was a private crossing: it is inventoried as a private road by the United States Department of Transportation, it is listed as a private road by NECR, it is marked private on the sign marking the street, the crossing is marked as private, the residents of the road maintain the road in all respects, and the town of Vernon provides no services to it.  U.S. Dept. of Transportation Crossing Inventory (Exhibit 17); Exhibit 7 at 0228; Vermont State Police Photo at Amtrak 0104, 0125 (Exhibit 18); Dep. of Bryan Pratt 26:4-20 (Exhibit 19); Dep. of Dawn Pratt, 28:8-10, Aug. 21, 2014 (Exhibit 20); Dep. of Michael Pratt 18:16-22, Aug. 21, 2014 (Exhibit 21).

> **RESPONSE:  Disputed.  The ownership of the road should be evidenced in the local property records which are not cited by Defendant.  The DOT Crossing Inventory**

**referenced is completed by railroad employees and has no binding legal effect. The cited material does not prove the assertion as required by Rule 56(c).**

59.     Mr. Scott has not looked into whether Bemis Road is a private road, but has no

reason to believe it is a public road.  Exhibit 6 at 116:11-117:16.

>    **RESPONSE:  Admitted that he so testified.**

60.     According to Mr. Scott, there is no Vermont law, federal law, federal regulation,

or railroad rule that required the engineer to sound the horn prior to the Crossing.  *Id.* at 76:23-

77:2, 118:10-23, 134:15-17, 135:22-136:7.

>    **RESPONSE:  Disputed. With respect to Vermont law, the material cited does not support the assertion as required by Rule 56(c).  Mr. Scott answered that he did not know whether there was any Vermont law that required the engineer to sound the horn prior to the Crossing.  With respect to regulation, the material cited does not support the assertion as required by Rule 56(c).  Mr. Scott answered that he could not think of one.  With respect to railroad rules the material cited does not support the assertion as required by Rule 56(c) in that it only refers to the GCOR, federal law, federal regulation, or railroad rule.  Defendant's Exhibit 6, 76:23-77:2.**

61.     Both the conductor and the engineer testified that they sounded the horn the same

way at every crossing.  Exhibit 13 at 16:22-17:6; Exhibit 12 at 22:10-13.

>    **RESPONSE:  Admitted that they so testified.**

62.     Because the Train was operating on NECR tracks, it was governed by the General

Code of Operating Rules, Effective April 7, 2010, Sixth Edition, ("GCOR").  Exhibit 15 at 2.

>    **RESPONSE:  Admitted in part.  Admitted that Mr. Scott's report states that the specific rules from the General Code of Operating Rules cited in the referenced material were rules that were required to be followed.  Although Plaintiff believes other rules from the GCOR, other rule books and the common law were required to be followed, the assertion must be considered disputed because the cited material does not address anything other than the specific rules mentioned, and therefore, does not comply with the requirements of Rule 56(c).**

63.     Under Rule 5.8.2, engineers operating on NECR track were not obligated to

sound a horn at a private crossing.  GCOR, Effective April 7, 2010, Sixth Edition (Exhibit 22).

**RESPONSE:  Admitted in part.  Admitted that Rule 5.8.2 does not address private crossings.  Disputed to the extent that this statement seeks an admission that the rule contains an express exclusion and to the extent that Defendant has failed to prove the crossing in question was private at the time of the incident because the cited material does not support either assertion as required by Rule 56(c).**

64.    In the event a train horn is not blowing properly, the GCOR requires the engineer to ring the train's bells throughout its journey and stop prior to each *public* crossing.  *Id.* at 5.8.3.

**RESPONSE:  Admitted.**

65.    Even if the horn were not functioning properly, there was no obligation to stop or change the Train's speed as it approached a *private* crossing.  *Id.*

**RESPONSE:  Disputed.  See deposition of Harald Keuerleber 115:3-116:8 (<u>Exhibit E</u>).**

66.    There is no dispute that the Train's bells were ringing consistently and its lights were on as it approached the Crossing.  Exhibit 5 at 4:05-4:32; Exhibit 11 at 15:22-16:2; Exhibit 9 at Amtrak 0001-0003.

**RESPONSE:  Disputed.  See deposition of Kyle Shippee 76:17-78:7 (<u>Exhibit A</u>); see deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (<u>Exhibit E</u>) discussing the two different event recorder downloads produced by Defendant for the same incident and supposedly for the same locomotive.  For a full discussion of the conflicting data downloads, see deposition of Harald Keuerleber 66:13- 73:11 (<u>Exhibit E</u>). See deposition of Harald Keuerleber 72:3-72:8; 74:23-75:20 (<u>Exhibit E</u>).**

67.    The horn on the Train's lead locomotive most recently passed the inspection required by the Locomotive Boiler Inspection Act on June 11, 2011.  Locomotive Horn Test Data Sheet (Exhibit 23).

**RESPONSE:  Disputed.  The material cited does not support the assertion as required by Rule 56(c).  See Defendant's Exhibit 23 which shows test results, but does not indicate whether the locomotive passed or failed.**

<u>The History of the Bemis Road Crossing</u>

68.     According to John Sullivan, Track Foreman of NECR, there is no history of prior

accidents or "incidents" at the Crossing.  Dep. of Sullivan 12:7-10, June 12, 2015 (Exhibit 24)

(nothing in past 20 years).

> **RESPONSE:  Admitted in part.  Plaintiff admits that Mr. Sullivan testified that he
> was not aware of any other incidents, but in all other respects disputed because any
> further assertions are not supported by the materials cited as required by Rule
> 56(c).**

69.     NECR performed regular maintenance of the vegetation around this crossing.  *Id.*

at 14:8-15:12, 16:2-17:14.

> **RESPONSE:  Admitted in part.  Admitted that the deponent discussed maintenance
> and spraying vegetation once a year, but disputed that such maintenance was
> "regular" and in all other respects because the cited material does not support the
> assertion as required by Rule 56(c).**

70.     In the past twenty years, there have not been any reports from any engineer or

conductor suggesting any concern with the sight lines for the Crossing.  *Id.* at 23:20-23.

> **RESPONSE:  Disputed.  See testimony cited by Defendant in support, wherein the
> deponent states that <u>he</u> has not gotten any reports.  The question and answer does
> not address any possible reports to anyone other than the deponent.**

71.     There are no more than ten homes on Bemis Road, which has no outlet.  Exhibit

20 at 23:14-26:7; Town Map (Exhibit 25).

> **RESPONSE:  Admitted.**

72.     For a pedestrian approaching the Crossing from Route 142, there was a clear line

of sight for "easily" over a hundred feet.  Exhibit 24 at 28:12-16; *see also* photograph of

Crossing Line of Sight (Exhibit 26); Exhibit 5 at 4:15-32.

> **RESPONSE:  Disputed. See deposition of defense expert Foster Peterson 84:19-
> 93:11 (<u>Exhibit D</u>).  See deposition of Kyle Shippee 24:14-25:6; 25:15-25:21; 34:16-
> 35:10 (<u>Exhibit A</u>).**

73.     The Brattleboro & Fitchburg Railroad company purchased the land where the

Crossing sits on March 13, 1849.  Volume 5 page 635 Town of Vernon Land Records (Exhibit

27); Affidavit of Patricia C. Happy, August 27, 2015 (Exhibit 28).

>    **RESPONSE:  Given the illegible condition of the exhibit, Plaintiff is without sufficient information to state either admitted or disputed; therefore, Plaintiff must answer disputed because the material cited, being illegible, does not support the assertion as required by Rule 56(c).  Further, the evidence is not and cannot be produced in a form that would be admissible at trial in the condition as attached to Defendant's motion.  Rule 56(B)(2).**

74.     The warranty deed conveying the property reserved a crossing at grade.  Exhibit

28(A).

>    **RESPONSE: Given the illegible condition of the exhibit, Plaintiff is without sufficient information to state either admitted or disputed; therefore, Plaintiff must answer disputed because the material cited, being illegible, does not support the assertion as required by Rule 56(c).  Further, the evidence is not and cannot be produced in a form that would be admissible at trial in the condition as attached to Defendant's motion.  Rule 56(c)(1)(B)(2).**

75.     Form B is a type of track bulletin that is placed in effect to protect railroad

employees or contractors when they are repairing or maintaining the track.  Exhibit 22 at 0399-

0400.

>    **RESPONSE:  Disputed.  The cited material does not support the assertion as required by Rule 56(c).  See Defendant's Exhibit 22 at 0399-0400.**

76.     The Plaintiff has made no claim that the level of crossing protection at the

Crossing was inadequate.  Fourth Supp. Response to Defendants' First Set of Interrogatories, 5-7

(Exhibit 29); Exhibit 6 at 135:2-7.

>    **RESPONSE:  Plaintiff is without sufficient information to either admit or dispute the assertion, because the attached Exhibit 29 contains neither a page 5, 6 or 7; nor does it contain responses to interrogatories 5, 6 or 7.  Further, Exhibit 6 at 135:2-135:7 is merely a statement by Plaintiff's expert witness on <u>train operations</u> that he is not going to give such an opinion.  Therefore, Plaintiff must answer disputed. See Fourth Supp. Response to Defendants' First Set of Interrogatories, 5-7 (Defendant's Exhibit 29); Defendant's Exhibit 6 at 135:2-7.**

# PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Plaintiff, by and through his counsel of record, for his Statement of Additional Undisputed Facts, states as follows:

1. Witness Kyle Shippee (hereinafter "Shippee), a friend who was with Pratt at the time he was killed, heard a train horn in his driveway shortly before the collision. See <u>Exhibit A</u>, deposition of Kyle Shippee 17:5-17:9.

2. The horn was farther down, way off in the distance. See <u>Exhibit A</u>, deposition of Kyle Shippee 17:5-17:9.

3. Shippee does not know whether Pratt heard it. See <u>Exhibit A</u>, deposition of Kyle Shippee 33:8-34:8.

4. The next time Shippee heard the horn was shortly before the Amtrak train struck Pratt. See <u>Exhibit A</u>, deposition of Kyle Shippee 21:25-22:14.

5. The second horn was 2 seconds before the train struck Pratt. See <u>Exhibit A</u>, deposition of Kyle Shippee 21:25-22:14.

6. From the video it is clear that Pratt was not aware of the train until he was on the track. See <u>Defendants' Exhibit 5</u>, Amtrak Video Recording.

7. Mr. Hemley, attorney for Defendant Amtrak, contacted Shippee after the collision and obtained an affidavit from him. See <u>Defendants' Exhibit 1</u>, Shippee Affidavit.

8. Mr. Hemley, while interviewing Shippee at his mother's home, wrote down additional statements and then wrote arrows to where Mr. Hemley believed they belonged in the affidavit. See <u>Defendants' Exhibit 1</u>, Shippee Affidavit; see <u>Exhibit A</u>, deposition of Kyle Shippee 29:18-30:17.

9. Mr. Hemley notarized the affidavit personally. See <u>Defendants' Exhibit 1</u>, Shippee

Affidavit.

10. Shippee did not understand the affidavit. See <u>Exhibit A</u>, deposition of Kyle Shippee 38:2-38:15; 39:3-39:8.

11. He has a learning and cognitive disability. See <u>Exhibit A</u>, deposition of Kyle Shippee 8:3-8:14.

12. Shippee cannot read cursive writing, and he could not understand the items written into the affidavit by Hemley, or the relevance of their placement. See <u>Exhibit A</u>, deposition of Kyle Shippee 29:18-30:17.

13. Two other nearby witnesses, Michelle Penza and Suzanne King never heard any horn before the collision. See <u>Exhibit 2, Vernon Police Department Report 7-8</u>; See <u>Exhibit F</u>, deposition of Michelle Penza 30:7-30:11; 57:13-57:17.

14. Michelle Penza (hereinafter "Penza") drove up to the crossing and stopped just in time to see the train which almost hit her vehicle. See <u>Exhibit F</u>, deposition of Michelle Penza 17:2-18:23.

15. Penza did not hear a horn before Pratt was struck and killed. See <u>Exhibit F</u>, deposition of Michelle Penza 30:7-30:11; 57:13-57:17.

16. Penza was surprised by the train as it was just a few seconds away from her at the clump of three (3) trees when she first noticed it. See <u>Exhibit F</u>, deposition of Michelle Penza 17:2-18:23.

17. Penza's father timed a 50 mph Amtrak train after the collision, and found it took 3 seconds to travel from the tree clump to the intersection. See <u>Exhibit F</u>, deposition of Michelle Penza 17:2-18:23.

18. Witness Suzanne King (hereinafter "King") was operating her motor vehicle

northbound on route 142 parallel to the railroad tracks, closely approaching the Bemis Road

crossing. See Exhibit 2, Vernon Police Department Report 7-8.

19.   King observed the boys walking, and not doing anything out of the ordinary.  See

Exhibit 2, Vernon Police Department Report 7-8.

20.   She saw the train approach from the south.  See Exhibit 2, Vernon Police

Department Report 7-8.

21.   King did not hear a train horn before the collision.  See Exhibit 2, Vernon Police

Department Report 7-8.

22.   King was startled at the speed of the train as it whizzed by her vehicle.  See Exhibit

2, Vernon Police Department Report 7-8.

23.   Defendants have provided 3 different recorded versions of the events leading up to

the collision, two event data recorder printouts and a video recording. See Exhibit G, Keuerleber

deposition Exhibit 2; Exhibit C, Keuerleber deposition Exhibit 7; Defendants' Exhibit 5, Amtrak

Video Recording.

24.   The video recording does not match up with the printouts from the train's event

recorder. See Exhibit G, Keuerleber deposition Exhibit 2; Exhibit C, Keuerleber deposition

Exhibit 7; Defendants' Exhibit 5, Amtrak Video Recording.

25.   The event recorders show the horn continuing after Pratt is struck by the train. See

Exhibit G, Keuerleber deposition Exhibit 2; Exhibit C, Keuerleber deposition Exhibit 7.

26.   In the video, the horn stops immediately when Pratt is struck by the train.

Defendants' Exhibit 5, Amtrak Video Recording.

27.   After a collision, the event recorder data was downloaded from the train involved,

Locomotive #108. See Exhibit E, deposition of Harald Keuerleber 19:4-19:12.

28. The data was downloaded by a computer cord attached to the event recorder and a laptop computer. See <u>Exhibit E</u>, deposition of Harald Keuerleber 19:4-19:12.

29. Then the raw data from the laptop then loaded using a computer program that read the data. See <u>Exhibit E</u>, deposition of Harald Keuerleber 22:15-25:12.

30. The speed and distance data is dependent on the diameter of the wheel on the locomotive, which is manually entered. See <u>Exhibit E</u>, deposition of Harald Keuerleber 28:4-28:13, 35:4-35-24.

31. Amtrak uses a form for the chain of custody of the event recorder data. See <u>Exhibit E</u>, deposition of Harald Keuerleber 12:21-13:7.

32. There is a chain of custody form for the video data downloaded from the digital video recorder onboard the train at the time of the collision. See <u>Exhibit E</u>, deposition of Harald Keuerleber 36:3-40:22.

33. Amtrak does not have a chain of custody form for the event recorder download of this incident. See <u>Exhibit E</u>, deposition of Harald Keuerleber 36:3-40:22.

34. Amtrak should have a chain of custody form for the event recorder download of this incident. See <u>Exhibit G</u>, deposition of Harald Keuerleber 40:5-40-22.

35. The chain of custody for the event recorder data in this case, has not and cannot now be proven without the form. See <u>Exhibit E</u>, deposition of Harald Keuerleber 37:9-37:13.

36. No one really knows where the event recorder data has been. See <u>Exhibit E</u>, deposition of Harald Keuerleber 15:9-15:13.

37. No one really knows whether the event recorder data has been altered. See <u>Exhibit E</u>, deposition of Harald Keuerleber 15:9-15:13.

38. There is no way of knowing whether the data produced even came from the event

recorder on the locomotive that was involved in the collision. See Exhibit E, deposition of Harald Keuerleber 36:19-37:13.

39.   In this case Defendants produced an event data recorder "printout" in response to a discovery request under sworn signature as true fact with a print date of February 27, 2012 and a wheel size entry of 37.5.  See Exhibit G, Keuerleber deposition Exhibit 2.

40.   A second event data recorder "printout" was produced by Amtrak corporate representative Mr. Harald Keuerleber, when he appeared for deposition as Defendant Amtrak's 30(b)(6) witness. See Exhibit E, deposition of Harald Keuerleber 48:13-48:19.

41.   Counsel for Amtrak initially tried to withhold this document as privileged.

42.   The  event data recorder "printout" produced by Mr. Keuerleber was printed closer to the date of the collision on February 1, 2012 and had a wheel size of 41".  See Exhibit C, Keuerleber deposition Exhibit 7.

43.   Changing the wheel diameter entered into the program will change the speed of the train. See Exhibit E, deposition of Harald Keuerleber 28:4-28:25.

44.   The different versions of data from the same collision, Exhibit G, Keuerleber deposition Exhibit 2; and Exhibit C, Keuerleber deposition Exhibit 7 were both produced by Defendants as true copies of printouts from the event recorder data.

45.   One item of data that is not dependent on the diameter of the wheel but is recorded in actual time and in tenth's 1/10 of a second is **the horn**.  See Exhibit E, deposition of Harald Keuerleber 105:1-105:8.

46.   Keuerleber deposition Exhibit 2 and Keuerleber deposition Exhibit 7 have inconsistent records of horn sounding  at the indicated time of 16:00:54. See Exhibit G, Keuerleber deposition Exhibit 2; and Exhibit C, Keuerleber Deposition Exhibit 7.

47. At the time of 16:00:54, Keuerleber deposition Exhibit 7 recorded that the horn of locomotive 108 activated at .7 and .8, while Keuerleber deposition Exhibit 2 recorded the horn of locomotive 108 activated at .8 and .9. See <u>Exhibit G</u>, Keuerleber deposition Exhibit 2; and <u>Exhibit C</u>, Keuerleber deposition Exhibit 7.

48. Keuerleber deposition Exhibit 2 recorded horn activation at 16:00:52 at .6,.7 and .8, while Keuerleber deposition Exhibit 7 recorded horn activation at .7, .8 and .9. See <u>Exhibit G</u>, Keuerleber deposition Exhibit 2; and <u>Exhibit C</u>, Keuerleber deposition Exhibit 7.

49. At the time of 16:00:50 Keuerleber deposition Exhibit 2 recorded horn activation at .6 and .7, while Keuerleber deposition Exhibit 7 recorded horn activation at .7 and .8. See <u>Exhibit G</u>, Keuerleber deposition Exhibit 2; and <u>Exhibit C</u>, Keuerleber deposition Exhibit 7.

50. At the time of 16:00:49 and, Keuerleber Deposition Exhibit 2 shows horn activation on at what should be .6, .5, .4 and .3, but the number 1's do not line up properly on the printout. See <u>Exhibit G</u>, Keuerleber deposition Exhibit 2.

51. There should not be any difference between the two alleged printouts from the same event recorder data. See <u>Exhibit E</u>, deposition of Harald Keuerleber 110:4-110:22.

52. Amtrak has no explanation for this difference. See <u>Exhibit E</u>, deposition of Harald Keuerleber 110:4-110:22.

53. At 16:00:55, Keuerleber Deposition Exhibit 7 indicates a train speed of 54 mph. See <u>Exhibit C</u>, Keuerleber deposition Exhibit 7.

54. At 16:00:55, Keuerleber Deposition Exhibit 2 indicates a train speed of 50 mph. See <u>Exhibit G</u>, Keuerleber deposition Exhibit 2.

55. The engineer and conductor had a duty to keep a careful lookout for pedestrians as they drove the train down the tracks. See <u>Exhibit E</u>, deposition of Harald Keuerleber 114:14-

115:8.

56.    The train crew has a responsibility to warn pedestrians as they approach a railroad crossing. See Exhibit E, deposition of Harald Keuerleber 115:9-115:16.

57.    The engineer has a duty to slow the train down if a pedestrian is not responding to a warning. See Exhibit E, deposition of Harald Keuerleber 115:21-115:24.

58.    The engineer has a duty to put the train in emergency if necessary to slow down if it is evident that the warning has not registered with the pedestrian. See Exhibit E, deposition of Harald Keuerleber 115:25-116:8.

59.    When dealing with human life it is better to err on the side of caution when making that decision. See Exhibit E, deposition of Harald Keuerleber 116:20-116:23.

60.    The brakes on the train were not engaged when the train struck and killed Eric Pratt. See Exhibit E, deposition of Harald Keuerleber 98:3-99:16; 121:23-122:2.

61.    Deciding to apply the brakes after a pedestrian has already been hit is the wrong time for the engineer to make the decision. See Exhibit E, deposition of Harald Keuerleber 123:17-124:5.

62.    This is the type of conduct that may well result in disciplinary action. See Exhibit E, deposition of Harald Keuerleber 124:6-124:10.

63.    The speed that a pedestrian is walking toward a crossing is a factor that a crew member should consider when deciding whether or not the pedestrian has received a warning and will stop. See Exhibit E, deposition of Harald Keuerleber 134:25-136:6.

64.    The fact that a pedestrian is walking casually or urgently is a factor that a crew member should consider when deciding whether or not the pedestrian has received a warning and will stop. See Exhibit E, deposition of Harald Keuerleber 134:25-136:6.

65.     Whether the crew ever saw the pedestrian look in the direction of the train is a factor that a crew member should consider when deciding whether or not the pedestrian has received a warning and will stop.  See Exhibit E, deposition of Harald Keuerleber 134:25-136:6.

66.     Observation of a pedestrian walking towards tracks and not acknowledging the train by speeding up or looking at it would weigh in favor of a pedestrian not stopping. See Exhibit E, deposition of Harald Keuerleber 134:25-136:6.

MICHAEL J. PRATT, by his attorneys

BEHRENS VENMAN PLLC

_____/s/ Robert S. Behrens_____
Robert S. Behrens (VT State Bar #2840)
11 Kilburn Street, Suite 216
Burlington VT  05401
(802) 658-5900 (telephone)
(802) 658-5222 (facsimile)
rsb@behrensvenmanlawvt.com

SULLIVAN LAW LLC
Robert C. Sullivan
1600 Baltimore, Suite 200
Kansas City MO  64108
(816) 221-9922 (telephone)
(816) 817-1962 (facsimile)
rsullivan@sullivantrial.com
*Admitted Pro Hac Vice*

ATTORNEYS FOR PLAINTIFF

## NOTICE OF SERVICE

The undersigned attorney for Plaintiff certifies that on October 20, 2015, I caused Plaintiff's Response to Defendants' Statement of Undisputed Facts and Plaintiff's Statement of Additional Undisputed Facts to be served through the Court's CM/ECF system on Robert B. Hemley, rhemley@gravelshea.com and Navah C. Spero nspero@gravelshea.com, Attorneys for Defendants.

_____/s/ Robert S. Behrens_____
Attorney for Plaintiff