UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

MICHAEL J. PRATT,                              )
Natural Father of Eric J. Pratt, Deceased,     )
    Plaintiff                                  )
                                               )
        v.                               )          Docket No. 2:13-cv-197
                                               )
NATIONAL RAILROAD PASSENGER                    )          **REQUEST FOR ORAL ARGUMENT**
CORPORATION, d/b/a AMTRAK,                      )
NEW ENGLAND CENTRAL RAILROAD,                   )
INC., MICHAEL E. KUJALA AND                     )
WILLIAM C. RAE,                                 )
    Defendants                                 )

### DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, by their attorneys, Gravel & Shea PC, reply in support of their Motion for

Summary Judgment ("Motion") as follows:

### Introduction

The parties are in agreement that Defendants' duty of care in the operation of the

northbound Amtrak train on January 15, 2012 was to keep a lookout, provide an audible

warning, and travel within the speed limit.  Nothing in Plaintiff's Opposition to Defendants'

Motion for Summary Judgment ("Opposition") establishes that there are material contested facts

as to Defendants' compliance with this duty.  Nor does Plaintiff contradict that Eric Pratt, the

Decedent, had an obligation to similarly keep a lookout as he approached the tracks, and be alert

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

to the possibility of an oncoming train, or that Mr. Pratt failed to even look up as he walked onto the tracks.

Because Plaintiff cannot dispute these basic facts, he instead raises two issues in an attempt to manufacture material factual disputes: (1) that the existence of event recorder printouts that use two different wheel diameters for the lead locomotive raises questions as to the validity of the underlying event recorder data which is used to compute the Train's speed; and (2) that the deposition of Kyle Shippee, the friend who suggested to Decedent that they "beat the train," raises questions as to what the Decedent heard or perceived on January 15, 2012.  As discussed more fully below, these arguments are mere distractions from the undisputed material facts.

Further, Plaintiff has failed to present evidence to support his other theories of liability. As a result, the Court should grant Defendants' Motion for Summary Judgment on all counts.

## Factual Background

Defendants have attached a Supplemental Statement of Undisputed Facts ("Supp. SUF") to this Reply to address Plaintiff's baseless accusations that Defendants improperly manipulated the event recorder data and printouts and coerced a witness into giving a false affidavit.  In any event, these accusations do not raise material issues of fact.

## Argument

It is clear from the parties' filings that they are in agreement regarding Defendants' duty of care with respect to train operation under Vermont's common law, the preemptive effect of the Federal Railway Safety Act ("FRSA") on any claim that the horn was blown in the wrong sequence, and Plaintiff's duties as he approached the Crossing.  The parties also agree that the

gravel &
shea |ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 2 -

video downloaded from the lead locomotive is authentic. *See generally*, Response to Defendants' Statement of Undisputed Facts ("RSUF").

Plaintiff attempts to create a factual dispute by pointing to the existence of two event recorder printouts with different wheel diameters. This attempt fails because the existence of these documents is easily explained and the two event recorder printouts do not create any disputes over the underlying data or the material facts. It is clear from the event recorder (regardless of wheel diameter), the undisputed testimony of the engineer and conductor, and the train video, that Defendants kept a proper look out, engaged the horn at the proper time, were travelling below the speed limit and took action to stop the train when it was clear the Decedent would not stop before stepping onto the tracks.

It is also clear from the video and all of Mr. Shippee's statements, both in his affidavits and his deposition, that there is no dispute that Decedent breached his duty to look and listen before crossing the tracks.

I.     AMTRAK SATISFIED ITS DUTY OF CARE AT THE CROSSING.

   A.     <u>Defendants Had Only A Common Law Duty Of Care As The Train Approached The Crossing.</u>

Plaintiff argues that Defendants have tried to disclaim that they had any common law duty to sound the horn by asserting that Bemis Road is a private road. Opposition, 12-13. Plaintiff misunderstands Defendants' arguments. Defendants have set forth the common law duties of a train crew as they approach a crossing on page 8 of their Motion: to keep a lookout, provide a warning, and travel within the speed limit. As part of their duty to keep a proper lookout, Defendants have a duty to slow down a train only when it becomes clear that a pedestrian or motorist will not move away from the tracks. As discussed more fully below in

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 3 -

Sections I.C.2-4, Defendants have also set forth undisputed facts proving that they complied with these duties.  RSUF, ¶¶ 27-28,[1] 31-34, 37-40, 43-45, 47-48.

Plaintiff does not cite to a single case that rebuts Defendants' statement of their duties to pedestrians as they approached the Crossing.  Instead, Plaintiff argues that Defendants had some additional duty based on statements made by Amtrak's 30(b)(6) deponent.  Although perhaps appealing on an emotional level, this testimony is irrelevant to the Court's legal analysis for three reasons.  First, the testimony is generally in accord with Defendants' statement of their duties as a train approaches a crossing.  Second, Amtrak cannot create a legal duty for itself beyond what Vermont common law requires and Plaintiff cites no case supporting the theory that it can or that it has.  Third, as discussed more fully below in Section I.C., Defendants satisfied all of their common law duties as the Train approached the Crossing.

The statements of Amtrak's 30(b)(6) witness are nothing more than common sense observations that if you apply brakes after impact, it cannot avoid the impact.  The obligation of the railroad, at common law, and as a matter of common sense, is to apply the brakes once it is apparent that the pedestrian will not stop before entering the tracks.  Not only is that determination nearly impossible to make in practice, in this instance there is neither evidence that the decision was made at the wrong time nor is their evidence that an earlier brake application would have made any difference.

---

[1] In Paragraph 28 of the Response to Defs.' Statement of Undisputed Facts, Plaintiff cites to the perceptions of witnesses to the accident to dispute what is heard on the train video.  While those witnesses testified they did not hear a horn before the accident, such testimony cannot and does not create a dispute with the objective video evidence, as discussed more fully below in Section I.C.3., citing *Scott v. Harris*, 550 U.S. 372, 380 (2007).

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 4 -

B.    <u>Preemption Precludes Any Argument Related To The Way The Horn Was Sounded.</u>

Contrary to Plaintiff's assertions in the Opposition, Defendants do not argue that all of the claims related to the horn are preempted by the FRSA.  Instead, Defendants argue that any claim that they had a duty to sound the horn in a particular pattern is preempted because the requirement to do so only applies to public crossings.[2]  At a private crossing like Bemis Road, Defendants' only duty is to generally provide a warning.

Plaintiff argues that preemption does not apply at all in this case because Defendants have failed to cite to a regulation that would apply in this instance.  This is incorrect.  *See* Motion, 13-14 (citing 49 U.S.C. §§ 20101, 20153(b) (2012) and 49 C.F.R. §§ 222.21(a), 222.25).  Because Section 222.25 is directly on point and excludes railroads from the requirement to sound their horns in a particular pattern at private crossings, any claim in this case regarding the horn pattern is preempted.

In an attempt to avoid preemption of the horn-pattern claim, Plaintiff also argues that Bemis Road is not a private road.  It is important to note that because an element of Plaintiff's claim – Defendants' specific duty in this case – depends on whether the Crossing is private or public, it is *Plaintiff's burden* to prove that the Crossing is public and the specific duty set forth in the FRSA applies to this accident.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").  "Where,

---

[2] For purposes of this argument, Defendants assume without admitting that the horn was not blown in the precise pattern required by Section 222.21(a) of the CFR.  Defendants believe the horn was sounded appropriately under the CFR, but understand that Plaintiff's expert disputes this fact.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

as here, the burden of proof at trial lies with the nonmoving party, the moving party generally carries its burden of making a properly supported motion by pointing to a lack of evidence on an issue sufficient to go to the trier of fact." *Griffin v. City of New York*, 287 F. Supp. 2d 392, 396 (S.D.N.Y. 2003).   To avoid summary judgment, it is the nonmoving party's burden to "come forward with admissible evidence sufficient to raise a genuine issue for trial." *Id.*  Plaintiff has failed to satisfy this burden.

Here, the only evidence before the Court establishes that Bemis Road is a private road: testimony from the people who live on the road, the Department of Transportation crossing inventory, the legal instrument deeding the land to the railroad, and the street sign at the entrance of Bemis Road.  RSUF, ¶ 58.  Plaintiff's factually unsupported response that there is additional evidence Defendants could use to prove the road was private fails as a matter of law.  Even assuming for a moment that there is other evidence – an assertion that is unsupported by any record evidence – this assertion alone is not enough to defeat the evidence produced by Defendants and satisfy Plaintiff's burden to prove that the heightened duty attached to a public crossing applies here.

As a matter of law, and based on the undisputed evidence, the only duty imposed on Defendants as it relates to the horn is a general duty to provide an audible warning as the train approached the Crossing.

C.     <u>Defendants Satisfied Their Duty Of Care As They Approached The Crossing.</u>

Defendants had three duties as they approached the crossing: keep a careful lookout, provide a warning, and travel within the speed limit.  Defendants satisfied all three duties based on the undisputed evidence.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 6 -

1.      The Event Recorder Data Remains Undisputed.

Plaintiff attempts to defeat Defendants' claim that they satisfied their duties by arguing that the event recorder data printouts are inauthentic because there are two printouts with different wheel sizes.  Plaintiff's argument is a mere distraction, as it fails to create a disputed material fact regarding the event recorder data or what happened during the accident.

In the first place, the video is the best evidence of what occurred in this case and the video only corroborates the event recorder printouts in all material ways.

Second, Plaintiff misstates that the printout is the critical evidence.  The critical evidence is the underlying data from which the printout is created, and Plaintiff has failed to present any facts to support his theory that the use of two different wheel sizes affects the integrity of the underlying data.

Third, Plaintiff's attempt to use the two printouts to call the underlying event recorder data into question is a slight of hand because the two different printouts are simple to explain. The printouts vary solely as the result of inputting different wheel sizes into the software and using different versions of the software – differences that are apparent on the face of both documents and are not suspicious or evidence of foul play in any way.

The data downloaded from the event recorder on locomotive 108 is analyzed with Wabtec software.  Suppl. SUF, ¶ 1.  The wheel size is needed to determine the exact speed of the train because the event recorder is measuring wheel revolutions and time.  *Id.* at ¶¶ 3, 5.  Unless the user manually enters a different number, the Wabtec software analyzes data that is remotely downloaded with a default wheel size of 41 inches, which is the nominal size of a brand new wheel.  *Id.* at ¶ 7; Plaintiffs' Exhibit E, 73:12-15.   After the data is downloaded, there is a single variable a user can input – the wheel diameter of the locomotive that is collecting the data.  Supp. SUF, ¶ 4.  This is by design, because over time, the diameter of a wheel reduces due to use.  *Id.*



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

at ¶ 6.  The wheel diameter affects the calculation of speed: the larger the wheel diameter, the faster the speed that is reflected.  *Id.* at ¶¶ 5, 9.  Other factors such as when the horn is sounded, how long the horn blasts are, or when the emergency brake is engaged, are unaffected by the wheel size because those factors relate to time, not speed.  *Id.* at ¶¶ 5, 6.

Both event recorder printouts (attached to Defendants' Motion as Exhibit 9 and attached to Plaintiff's Opposition as Exhibit C) establish that Defendants fulfilled all of their duties and are consistent with each other in all material ways.  Exhibit C is the printout created using the 41-inch default wheel size and displays a speed of 54 miles per hour at the time of the accident, below the 55 mile per hour speed limit.  *See* Exhibit C.  An Amtrak employee created Exhibit C as part of Amtrak's internal investigation to review factors unrelated to speed and distance.  Supp. SUF at ¶ 15.  Amtrak's expert, Foster Peterson, created Exhibit 9 using the 37.5-inch wheel size that was measured from locomotive 108 by a mechanic in New Haven, Connecticut on January 16, 2012, and conveyed to Mr. Peterson in February 2012.  *Id.* at ¶ 16.[3]  Using the 37.5-inch wheel size, the speed at the time of the accident is 50 miles per hour.  *See* Exhibit 9.  Whichever diameter is used, the difference is immaterial.[4]

---

[3] Plaintiff has also argued that the absence of a chain of custody document somehow is an indictment of the event recorder data.  This is not a criminal case and Amtrak is not the police.  There is no legal requirement that Amtrak have a document reflecting the chain of custody.  Defendants have attached affidavits from the Assistant Superintendent who downloaded the data and the mechanic who measured the wheel size to support the evidence already before the Court on page Amtrak 001 of Exhibit 9.  Supp. SUF ¶¶ 10-14; Exhibits 32, 33.

[4] In fact, the 37.5-inch diameter (and the 50 miles per hour speed it produces) is the accurate measurement.  *See* discussion, *infra*.  Mr. Keuerleber, Amtrak's 30(b)(6) witness, was unable to testify to which wheel diameter was accurate because Plaintiff's counsel chose not to show Mr. Keuerleber the first page of Exhibit 9, the Accident/Incident report that showed that the 37.5-inch diameter was correct.  Amtrak has served Plaintiff with corrections to Mr. Keuerleber's deposition based on the information that was withheld during his deposition.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 8 -

Plaintiff has also asserted, again without factual support, that the event recorder data and printouts were manipulated because the horn column of Exhibits 9 and C are not identical in their placement of the "1s" that indicate the tenth of a second increments when the horn was sounding. In any event, this assertion is immaterial, because a comparison of the two printouts shows that while the placement of a "1" within a specific column might differ, there is no difference in which rows contain a "1", confirming the horn blew. The same number of "1s" are included on each row of both printouts. Plaintiff also fails to offer any expert opinion that these differences are out of the ordinary for two printouts created with different versions of the Wabtec software, like Exhibits 9 and C were. Suppl. SUF, ¶ 17. As indicated on the top right hand corner of each printout, Exhibit 9 was created with Version 3.13.6.0 of the Wabtec software, whereas Exhibit C was created with an out of date Version 3.9.3.0. *Id.* at ¶ 18. As with the wheel diameters, the explanation as to the minute variation in the printout is simple.

It is not coincidental that Plaintiff failed to submit an affidavit from his expert on train handling, Mr. Scott, as evidence that any of the differences in the two printouts are material to this case or indicate that the underlying data used to create the two printouts is unreliable in some way. Mr. Scott, or any other expert, would be unable to truthfully make that representation.

In other words, Plaintiff spends pages of his Opposition asserting that these two versions of the event recorder printout create a dispute of material fact but fails to provide any evidence to support any argument that the printouts actually contain a single fact that contradict each other or that any such dispute is material.

2.      The Engineer And The Conductor Maintained A Careful Lookout.

Both the engineer and the conductor testified that they kept a careful lookout, they saw Mr. Shippee and the Decedent prior the accident, and the engineer sounded the horn as he

gravel &
shea   ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 9 -

approached the Crossing.  *See* RSUF ¶¶ 37-40, 44.  No testimony or other evidence contradicts these statements.

The video corroborates this testimony.  Exhibit 5 at 4:02-4:32.  As the Train approached the crossing at Rinfret Road, the crossing just south of Bemis Road, the engineer sounds a typical sequence as he approached a crossing.  4:02-4:15.  Then, at 4:17 the engineer begins to sound the horn normally for the Bemis Road crossing, but interrupts it at 4:19 when he observes a car approaching from the left (west), and sounds an additional series of quick blasts to alert the car. When the car stops at approximately 4:21, the engineer reverts to a more typical blast pattern until 4:24.  At 4:25, the moment Mr. Shippee and the Decedent are clearly visible, the engineer begins blowing the horn continuously to alert them.  Mr. Shippee can then be seen running and clearing the Crossing at 4:27.  It is not until almost four second later, when the Decedent steps onto the tracks that the engineer realizes he will not stop and takes action to engage the emergency brakes.  *See also* Supp. SUF at ¶ 19.

Both versions of the event recorder also corroborate this evidence.  *See* Exhibit 9 at Amtrak 003-004; Exhibit C at 1.  In fact, all of the indisputable evidence supports Defendants' argument that the engineer and conductor fulfilled their duties to keep a careful lookout because their actions were responsive to the events unfolding in front of them.

Even if Plaintiff could set forth some evidence to dispute that Defendants fulfilled their duties to keep a proper lookout and engage the brake when it became clear Mr. Pratt would not stop, he has failed to set forth any evidence that would show a causal link between these alleged breaches and Decedent's death.  Mr. Scott, Plaintiff's expert on train handling, specifically disavows any ability to opine on factors related to human behavior, such as how Decedent was walking.  Supp. SUF at ¶ 21.  Plaintiff has not retained an expert to opine that if the engineer had

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 10 -

sounded the horn differently or engaged the brakes earlier, Mr. Pratt would have survived, and there is absolutely no basis upon which the Court can assume this is accurate.

Both sets of event recorder printouts illustrate that in the two seconds after the emergency brake was engaged the Train's speed decreased by either zero or one mile per hour.  It took four seconds to slow the train just 4 m.p.h.  Exhibit 9 at Amtrak 003-004; Exhbit C at 1.  Plaintiff has presented no evidence that even if the emergency brake had been engaged at the first moment Decedent and Mr. Shippee are visible in the video at 4:25, it would have prevented Decedent's death.  To the contrary, Mr. Scott opined that it would take three to five seconds for the brakes to become fully effective once they were engaged.  Supp. SUF at ¶ 20.

It is Plaintiff's burden to establish all three parts of a negligence claim and he has failed to set forth any evidence that the brake was not engaged at the right moment or that any failure to engage the brake sooner proximately caused the Decedent's death.

      3.      Defendants Fulfilled Their Duty To Provide A Warning Of The Train's Approach.

Defendants provided a warning of the Train's approach by sounding a bell and a horn and using a headlight and side lights.  The bells can be audibly heard on the Train's video and both versions of the event recorder printouts indicate that they were "On" in the "Bell" column.  It is also clear from the video that the head light and the flashing sidelights were on because the headlight is reflected in the snow and in Decedent's face immediately before the accident and the reflection of the side lights can be seen flashing in the trees.  Exhibit 5 at 4:15-32.  Plaintiff has not presented any evidence to dispute these material facts.

The horn is audible on the video recording and, as detailed in the previous sub-section and the Motion, was sounded as the Train approached the Crossing.  The event recorder corroborates what can be heard in the Train's video, and a comparison of the correct event

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 11 -

recorder printout (Exhibit 9) and the video illustrates that they support each other.  As discussed

above, contrary to what Plaintiff argues, there is no real dispute about the event recorder data,

either.

Perhaps recognizing that all of the objective data and Plaintiff's own expert's testimony

support the fact that the horn sounded as the Train approached the Crossing, Plaintiff disputes

that the "horn sounded as stated or heard on the video," and cites to Ms. Penza's and Mr.

Shippee's depositions where they indicate that as the Train approached the Crossing, they did not

hear the horn.  RSUF, ¶ 28.  This attempt fails as a matter of law.

"When opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that version of

the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S.

372, 380 (2007).  In *Scott*, the plaintiff was a criminal defendant who filed a section 1983 claim

against a police officer who rammed his car during a high speed chase, permanently paralyzing

plaintiff.  The lower court denied summary judgment, finding that there were disputed facts

because the plaintiff's statements that he travelled in a controlled manner on the highway

differed from the officer's version and the video recording from his patrol car which showed

plaintiff driving dangerously.  The Supreme Court reversed, holding that although the plaintiff

and the video "tell quite a different story," *id.* at 379, where the integrity of the video is intact, an

eyewitness statement does not create a disputed fact with a video for purposes of defeating

summary judgment, *id.* at 379-380.

Plaintiff does not dispute the authenticity of the video, nor does he question any other

aspect of the video – in fact he relies on it throughout his Response to Defendants' Statement of

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 12 -

Undisputed Facts.  He cites no facts to support his assertion that the video is misleading and cannot establish that the horn or the video malfunctioned.[5]

Instead, Plaintiff asks the Court to ignore *Scott* and find that the contradictory testimony of two witnesses creates a disputed fact because it differs from objective video evidence.  The Court should decline to do so.  Ms. Penza is the only witness who testified that the horn did not sound, but her testimony is unreliable and lacks a foundation, as discussed more fully in the Motion at 10-11.  Mr. Shippee has testified three times that he first heard the horn in his driveway and two times that he heard it again two seconds before the accident, but did not hear the horn in between.  Exhibit 1 at ¶ 6; Exhibit 4; Supp. SUF, ¶ 22.  If anything, this testimony confirms the objective data and defeats Plaintiff's argument that the horn did not sound like it did in the video, because it establishes that the horn was audible to a pedestrian walking along highway 142 and near the tracks.  That Mr. Shippee only remembers hearing the horn for two of the seven seconds immediately before the accident cannot create a disputed fact under *Scott* because it is directly contradicted by objective evidence and Plaintiff has not offered any explanation for why the video evidence should be discarded.  *See also Wilson v. Walker*, 2015 U.S. Dist. LEXIS 137088, 16-18  (S.D. Ga. Oct. 7, 2015) (finding summary judgment in defendant's favor based on video evidence showing that plaintiff's injuries were minor and did not meet the Eighth Amendment threshold, even though plaintiff testified that his injuries were severe).

---

[5] Plaintiff contests Defendants' assertion in paragraph 67 of the Statement of Undisputed Facts that the horn most recently passed inspection prior to the accident on June 11, 2011 because the document does not state whether the horn passed the inspection.  Defendants ask the Court to take judicial notice of 49 C.F.R. § 229.129(a) which sets forth the required decibel levels for a horn and to also note that Exhibit 23 reflects test readings within that range.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Plaintiff has failed to offer any possible explanation for the sudden change in the horn's volume between the time Mr. Shippee left his house, the ten seconds before the accident, and the two immediate seconds before the accident.  The sound of the horn remains consistent throughout the video.

Plaintiff has also failed to defeat Defendants' argument that the absence of winter weather that day disproves Mr. Scott's theory that snow and ice caused the horn to be muffled. In response to Defendants' argument, Plaintiff states that Mr. Scott has other opinions regarding the inadequacy of the horn.  Defendants have not been provided with any such opinions and Plaintiff does not cite to any such opinion anywhere in Mr. Scott's report or deposition.[6]  Aside from being precluded from now advancing undisclosed opinions in support of his burdens here or at trial, Plaintiff has failed to satisfy his burden to prove the horn malfunctioned.  The only evidence before the Court is that there was no ice or snow buildup on the horn, and therefore nothing to support the only opinion which Mr. Scott has offered – that the horn was muffled.  *See* RSUF ¶ 57.

      4.     The Train Was Travelling Within The Speed Limit At All Relevant Times.

Both versions of the event recorder printouts indicate that the Train was travelling less that the 55 miles-per-hour speed limit set for this area of track.  Plaintiff has no contrary evidence, and it is his burden to prove that Defendants exceeded the speed limit.

---

[6] Plaintiff argues that Defendants' statement of facts fails to comply with the requirement in F.R.C.P. 56(c) to cite to particular parts of the record to support their assertion that Mr. Scott's opinion is as stated.  Plaintiff misstates Defendants' burden of production, as noted above in Section I.B.  Defendants cited to the "Conclusion" section of Mr. Scott's expert report to support their assertion that those conclusions encompass all of Mr. Scott's opinion regarding the muffling of the horn.  It is Plaintiff's burden to cite any other record evidence to support his contention that there are other admissible opinions and he has failed to do so because none exist.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 14 -

II.    DECEDENT FAILED TO SATISFY HIS DUTY OF CARE TO LOOK AND LISTEN.

Plaintiff's Opposition does not cite to a single case contradicting Mr. Pratt's unambiguous duty to look for an oncoming train as he approached the Crossing.  The basic rule is well established – a pedestrian has a duty to look up as he approaches a railroad track.  *See Eagan v. Douglas*, 107 Vt. 10, 16, 175 A. 222, 224-225 (1934); Restatement (Second) of Torts, § 480, comment b.

Plaintiff asks the Court to deny Defendants' Motion because two facts set forth by Defendants are disputed: the timing of when Mr. Pratt looked up at the Train while on Bemis Road and Mr. Pratt's awareness of the Train as he approached the Crossing.  Both disputes are immaterial given Mr. Pratt's legal duties.

In his affidavits, Mr. Shippee stated that Decedent looked up as he walked on Bemis Road approaching the Crossing.  Exhibit 1 at ¶ 6; Exhibit 4.  In his deposition, Mr. Shippee stated that what he meant was that Mr. Pratt looked at the Train when he was already on the tracks.  Supp. SUF, ¶ 23.  It is clear from the video that an instant before the Train hit him, Mr. Pratt looked at the Train.  Exhibit 5 at 4:31-32.  The dispute over whether Mr. Pratt looked up before he stepped on the tracks is not material because the legal conclusion is the same under either set of facts.  Either the Decedent saw the Train as he approached the tracks from highway 142 and breached his duty to yield to the train or he failed to look up, which breached his duty to look and listen before he stepped onto the tracks.

In his affidavits, Mr. Shippee also stated that Mr. Pratt heard Mr. Shippee suggest that they "beat the train."  Exhibit 1 at ¶ 6; Exhibit 4.  Mr. Shippee testified at his deposition that he does not know whether the Decedent heard him say "beat the train," but he acknowledges that the two engaged in regular conversation that day, that Mr. Pratt did not have any hearing

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 15 -

problems that day, and that the two were standing next to each other when he said it.  Supp. SUF, ¶ 29.  This dispute is also immaterial because it does not change Mr. Pratt's duties to himself.

Because the disputed facts cited by Plaintiff are not material, he attempts to defeat the Motion by asserting that Defendants' counsel fabricated Mr. Shippee's affidavit and then pressured him into signing something that was not true.  Opposition, 4-7.  This accusation is not only offensive and baseless, but also demonstrably false and insufficient to defeat Defendants' Motion.

Defendants attached two affidavits to their Motion, both dated July 10, 2014.  One was handwritten by Mr. Shippee before Defendants' counsel arrived at his house.  Supp. SUF, ¶ 24.  The other was prepared by Defendants' counsel based on what Mr. Shippee had stated during a telephone conference on July 4, 2014.  *Id.* at ¶ 25.  The two are substantially the same.  Defendants have attached an affidavit from their counsel explaining what occurred when he met with Mr. Shippee in July 2014, as well as e-mails sent by counsel to Mr. Shippee prior to their in-person meeting reflecting that they spoke on the phone.  *Id.* at ¶ 24; Exhibit 37.  Furthermore, any accusation that Defendants' counsel behaved inappropriately because Mr. Shippee was a minor is factually incorrect.  He was 18 during the July 2014 meeting.  *Id.* at ¶ 27.  Additionally, Mr. Shippee's mother was at home throughout the interview, primarily steps away in the kitchen separated by a screen door, and whether or not she listened in on the interview, Mr. Shippee could have at any time asked to stop, or to speak with his mother.  *Id.* at ¶ 28.  He did not.  *Id.*

Nothing offered by Plaintiff creates a disputed material fact regarding Mr. Pratt's failure to fulfill his undisputed duty to himself.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

III.     THE COURT SHOULD DISMISS ALL REMAINING CLAIMS.

     A.     <u>Plaintiff Has Consented To The Dismissal Of Many Of The Remaining Claims.</u>

Defendants' Motion sought summary judgment on all of the remaining claims against each Defendant.  In support of this argument, Defendants pointed out that with the exception of Mr. Scott's expert testimony on the adequacy of the horn and the failure to apply the brakes, Plaintiff lacked necessary expert testimony for every other claim in his case.

In his Opposition, Plaintiff concedes that he does not intend to submit the claim that "Amtrak was negligent in failing to evaluate the dangers of the Crossing and failing to provide additional protection because the crossing was ultra-hazardous."  Opposition, 18.  Plaintiff further concedes that he does not intend to pursue the claim that "Amtrak hired and retained a crew that it knew or should have known was not competent."  *Id.*

Based on Plaintiff's concessions, the Court should dismiss the following Counts of Plaintiff's Complaint:

- Count I, paragraphs 21.b.,[7] 21.c., 21.d., 21.h., and 21.i.

- Count I, paragraph 25.d. and 25.e.

- All of paragraph 32 of Count II, except subpart c.

- Count III, paragraph 37.d.

---

[7] In his Opposition, Plaintiff does not cite to specific paragraph numbers in conceding that he lacks the evidence to pursue certain claims, and it is therefore unclear whether he meant to include Paragraph 21.b.  Paragraph 21.b. alleges that Amtrak was negligence in "failing to provide adequate warning of approaching trains at the Subject Crossing."  Plaintiff has failed to present any expert testimony on this point to establish what the appropriate level of crossing protection would be at a private crossing with fewer than ten homes on the other side.  As a result, this claim fails, even if it was not conceded.  *Bridger v. Union R. Co.*, 355 F.2d 382, 389 (6th Cir. 1966) ("It is absurd to contend that the average layman has, as a matter of common knowledge, a sufficient grasp of the diverse factors which must be considered in constructing and maintaining an acutely angled railroad crossing which will afford a maximum of safety and a minimum of inconvenience to vehicular traffic and train movement.").



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- Count IV, paragraph 42.d.

B.   **The Court Should Grant Summary Judgment On Any Claim That Amtrak Failed To Require Its Crews To Sound An Audible Warning At Railroad Crossings.**

In  Paragraph 21.a. of the Amended Complaint, Plaintiff alleges Amtrak failed to require its crew to sound an audible warning at the Crossing.  This claim is contradicted by the testimony of the engineer and the conductor, who testified that based on their training, they always sounded the horn at every crossing.  *See* RSUF, ¶ 61.  It is also contradicted by the operative rule book. *See* Exhibit 22.  There is no other evidence offered by Plaintiff to contradict this point and it should therefore be dismissed.

C.   **The Court Should Grant Summary Judgment On The Vegetation Claim Against NECR.**

The Court should also dismiss Plaintiff's claim that NECR was negligent in maintaining the vegetation around the Crossing.  First, expert testimony is generally necessary to prove a vegetation maintenance claim.  *See Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978 (6th Cir. 2004) (expert testimony presented to prove that vegetation would have prevented motorist from seeing train until too late); *Stonebarger v. Union Pac. R.R. Co.*, 76 F. Supp. 3d 1228, 1245 (D. Kan. 2015) (expert testimony presented to prove that vegetation blocked sightlines of motorist crossing railroad track); *Ill. Cent. R.R. Co. v. Hawkins*, 830 So. 2d 1162, 1171 (Miss. 2002) (same).  Plaintiff has failed to offer necessary expert testimony to support any of the elements of this claim and it therefore fails as a matter of law.  *See Henderson v. Amtrak*, 412 F. App'x 74, 86-87 (10th Cir. 2011) (affirming summary judgment in favor of defendant on plaintiffs' vegetation negligence claim where plaintiffs failed to present any admissible expert testimony to show railroad breached its duty by failing to adequately clear vegetation at crossing).

Nor do the undisputed facts support this claim.  Ms. Penza's testimony on this point is irrelevant because she was on the west side of the Crossing, whereas Decedent approached from



gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 18 -

the east side.  RSUF, ¶ 30.  Mr. Shippee's testimony is, at best, confusing and contradictory on this point.  In the portion of testimony cited by Plaintiff, Mr. Shippee concedes that as one approaches the tracks from the east, there is a point in time before reaching the tracks where a train approaching from the south is visible.  In fact, he marked this location on Exhibit 3 to his deposition.  Supp. SUF, ¶ 30.  Mr. Shippee also testified that when he went over the Crossing from his house to the Pratt house, he generally looked before he crossed and that there had been times when he had seen a train approaching from the south and stopped before crossing the tracks to allow the train to pass.  Supp. SUF, ¶ 31.

Mr. Shippee's testimony is also directly contradicted by the video evidence, which indisputably shows that the Train was visible to Decedent for seven seconds before the collision – ample time for a pedestrian to look up and stop.  Exhibit 5, 4:25-4:32.  In addition, a comparison of recently taken pictures and the video indicate that there is no significant difference in the sight line facing south from the Bemis Road crossing.  *Compare* Exhibit 26 with Exhibit 5 at 4:17-4:32.

Most importantly there is no evidence to prove that any purportedly overgrown vegetation caused Decedent's death.

Finally, Plaintiff asserts that his claim that the sight line was inadequate should survive because NECR subsequently cut down certain trees.  This evidence cannot create a disputed fact because, even if it was relevant –and it is not – it is inadmissible under F.R.E. 407.  *See* F.R.C.P. 56(c)(2).  Nor is Mr. Shippee's testimony clear enough to create a disputed fact.  He does not clearly indicate which trees were cut down, how those trees appeared at the time of the accident, or how that changed the sight distance at that location.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Conclusion

Based on the foregoing, Defendants ask the Court to grant them summary judgment on all counts and claims and enter judgment in their favor.

Dated:          Burlington, Vermont
                November 20, 2015


                                        /s/ Robert B. Hemley
                                        Robert B. Hemley, Esq.
                                        Navah C. Spero, Esq.
                                        Gravel & Shea PC
                                        76 St. Paul Street, 7th Floor, P. O. Box 369
                                        Burlington, VT  05402-0369
                                        (802) 658-0220
                                        rhemley@gravelshea.com
                                        nspero@gravelshea.com
                                        For Defendants

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION                    - 20 -