UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

| | | |
|---|---|---|
| MICHAEL J. PRATT, Administrator<br>of the Estate of Eric J. Pratt,<br>    Plaintiff | )<br>)<br>)<br>) | |
| v. | ) | Docket No. 2:13-cv-197 |
| NATIONAL RAILROAD PASSENGER<br>CORPORATION, d/b/a AMTRAK,<br>NEW ENGLAND CENTRAL RAILROAD,<br>INC., MICHAEL E. KUJALA AND<br>WILLIAM C. RAE,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) | |

## AMTRAK'S SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS

1. Data downloaded from the Integrated Function Control (IFC) locomotive event recorders on Amtrak 108 is played back by the Wabtec Data Analysis Software, which can be used to create a printout that details the speed of the train, the use of the horn, the time of the application of the brakes, the stopping distance of the train and much more. Aff. of Peterson, ¶ 2, November 20, 2015 (Exhibit 30).

2. It is not possible for someone to alter or manipulate this data while it is stored on the event recorder or once it is downloaded from the locomotive. *Id.* at ¶ 3.

3. The event recorder does not record speed directly; rather, it records rotation of one of the locomotive's axles (one axle has two wheels) over time. *Id.* at ¶ 4.

4. After the data is downloaded from the event recorder, the user can enter one variable, the wheel diameter of the locomotive that is collecting the data. *Id.* at ¶¶ 4,6.

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

5. The Wabtec software uses the size of the wheel to calculate the speed and distance based on the wheel revolutions and time. *Id.*

6. None of the other factors are affected by the wheel size because they relate to time, instead. *Id.* at ¶ 4; Dep. of Keuerleber 28:22-29:2, September 15, 2015 (Exhibit 31).

7. Unless the user manually enters a different number, the Wabtec software analyzes the data with a default wheel size of 41 inches, which is the nominal size of a brand new wheel. Exhibit 30, ¶ 5; Pl. Exhibit E, 73:12-15.

8. By design, the software lets you manually alter the wheel size, because over time, the diameter of a wheel decreases due to use. Exhibit 30, ¶ 6.

9. The actual wheel diameter must be entered to allow the software to convert this wheel rotation data into speed of the locomotive and the distance that it travelled. *Id.* at ¶¶ 4, 6.

10. In this case, the event recorder data was downloaded remotely from locomotive 108 by the Assistant Superintendent, Road Operations, on January 16, 2012. Aff. of T. Rae, ¶¶ 1,6, November 16, 2015 (Exhibit 32).

11. Once downloaded to the Assistant Superintendent's computer, it was uploaded to Amtrak's secured shared "S" drive. *Id.* at ¶¶ 3, 4, 7.

12. The underlying data was never altered or manipulated, and has remained on the shared drive. *Id.* at ¶¶ 8, 9; Exhibit 30, ¶ 3.

13. The wheel size for locomotive 108 was measured by Paul Carver, a mechanic, on January 16, 2012. Aff. of Carver, ¶¶ 1,3, November 19, 2015 (Exhibit 33).

14. The wheel size measured by Mr. Carver was 37.5 inches. *Id.* at ¶ 4.

15. An Amtrak employee created Exhibit C as part of Amtrak's internal investigation to review factors unrelated to speed and distance. Exhibit 30, ¶ 9.

gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 2 -

16. Amtrak's expert, Foster Peterson, created Exhibit 9 based on the wheel size that was measured by a mechanic in New Haven, Connecticut on January 16, 2012, and conveyed to Mr. Peterson in February 2012. *Id.* at ¶¶ 8, 11; Exhibit 33, ¶¶ 1, 3.

17. The printouts attached as Exhibit C to the Opposition and Exhibit 9 of the Motion were created using two different versions of the Wabtec software. Exhibit 30, ¶ 14.

18. Exhibit 9 was created with Version 3.13.6.0, whereas Exhibit C was created with an out of date Version 3.9.3.0. *Id.*

19. The engineer did not realize that Decedent would not stop until approximately 4:31 in the video and approximately 16:00:54 on the event recorder when the Decedent steps onto the tracks, and at that point he took action to engage the emergency brakes. Exhibit 12, 30:6-14; Exhibit 9 at Amtrak 003; Exhibit 31 at 131:20-133:2 (noting the reaction time between deciding to engage the brakes and physically engaging them); Dep. of Peterson 32:23-33:16 (Exhibit 34) (noting that the word "suppress" in the EAB Brake column on the event recorder indicates the engineer is moving the handle toward emergency position).

20. Plaintiff's expert, James Scott, opined that it would take three to five seconds for the brakes to become fully effective once they were engaged. Dep. of Scott 101:19-102:22 (Exhibit 35).

21. Mr. Scott disavowed any expertise on human factors that contributed to this accident. *Id.* at 28:21-25, 88:4-19.

22. Mr. Shippee testified during his deposition that he heard the horn once in his driveway and again two seconds before the accident. Dep. of Shippee 22:6-20, 73:7-74:7 (Exhibit 36).

gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 3 -

23. In his deposition, Mr. Shippee stated that what he meant in paragraph 6 of the typed affidavit and in the handwritten affidavit is that when Mr. Pratt looked up at the Train from Bemis Road, he was already on the tracks. *Id.* at 34:9-23, 23:16-27:1.

24. The affidavit that Mr. Shippee wrote by hand was drafted by Mr. Shippee before Defendants' counsel arrived at the Shippee house. *Id.* at 11:19-12:17; Aff. of Hemley, ¶ 7, November 20, 2015 (Exhibit 37).

25. The typed affidavit was prepared by Defendants' counsel based on what Mr. Shippee had stated during a telephone conference on July 4, 2014. Exhibit 36 at ¶¶ 4, 6.

26. E-mails sent by Defendants' counsel to Mr. Shippee prior to their meeting reflect that Mr. Shippee spoke to counsel on the phone prior to his visit. *Id.* at ¶ 5.

27. Mr. Shippee was 18 years old at the time he met with Defendants' counsel in July 2014. Exhibit 36 at 109:22-25.

28. Mr. Shippee's mother was at home throughout the interview, primarily steps away in the kitchen separated by a screen door, and whether or not she listened in on the interview, Mr. Shippee could have at any time asked to stop, or to speak with his mother, but he did not. *Id.* at 108:21-109:18; Exhibit 37 at ¶¶ 12-13.

29. Mr. Shippee testified at his deposition that he does not know whether the Decedent heard him say "let's beat the train," Exhibit 36 at 33:20-25, but he acknowledges that the two engaged in regular conversation that day, *id.* at 71:17-72:19, that Mr. Pratt did not have any hearing problems that day, *id.* at 73:2-4, and that the two were standing next to each other when he said it, *id.* at 78:8-15.

gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 4 -

30. During his deposition, Mr. Shippee created drawings (Exhibits 3 and 4 to the deposition, and attached hereto as Exhibits 38 and 39) showing Mr. Pratt's position as the Train approached the Crossing and became visible to him. *Id.* at 24:10-27:15, 87:10-25.

31. Generally, when Mr. Shippee went over the Crossing while walking from his house to the Pratt house, he looked before he crossed and that there had been times when he had seen a train approaching from the south and stopped before crossing the tracks. Exhibit 36 at 100:18-104:15.

Dated: Burlington, Vermont
November 20, 2015

/s/ *Robert B. Hemley*
Robert B. Hemley, Esq.
Navah C. Spero, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P. O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
rhemley@gravelshea.com
nspero@gravelshea.com
For Defendants

gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION