UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MICHAEL J. PRATT,                  :
Administrator of the Estate        :
of Eric J. Pratt, Deceased,        :
                                   :
    Plaintiff,                     :
                                   :
        v.                         :   Case No. 2:13-cv-197
                                   :
NATIONAL RAILROAD PASSENGER        :
CORPORATION (d/b/a AMTRAK),        :
NEW ENGLAND CENTRAL RAILROAD,      :
INC., MICHAEL E. KUJALA, AND       :
WILLIAM C. RAE,                    :
                                   :
    Defendants.                    :

## OPINION AND ORDER

In 2012, fifteen-year-old Eric Pratt was struck and killed by an Amtrak passenger train while walking across railroad tracks near his home in Vernon, Vermont.  Eric's estate brings this action alleging negligence by the railroad, the owner of the tracks, the train's conductor, and its engineer.  The Defendants have moved for summary judgment on all claims.

For the reasons set forth below, the Court finds that based upon the undisputed factual record, which includes a video of the incident, no reasonable juror could conclude that the Defendants are liable for Eric's tragic death.  The motion for summary judgment is therefore **granted**, and this case is **dismissed**.

## Factual Background

### I.   The Undisputed Facts

On January 15, 2012, Eric and his friend Kyle Shippee walked

to Kyle's house to retrieve a video game.  In order to return to Eric's house, the two young men had to cross a set of railroad tracks.  Kyle crossed the tracks just ahead of an oncoming Amtrak passenger train.  Eric also tried to cross the tracks, but was struck by the train and killed.

Kyle's house was on Vermont Route 142, which runs parallel to the railroad tracks.  After Eric and Kyle retrieved the video game, they walked approximately 50 yards north on Route 142, then turned west onto Bemis Road.  Bemis Road, which has been both marked and maintained as a private road, crosses the tracks. There are no fixed lights, gates, or bells at the Bemis Road crossing, and there is no allegation that any were required.

Kyle testified at his deposition that he first heard the horn of an approaching train when leaving his driveway.  Because freight trains had recently been stopping on the Bemis Road portion of the tracks, Kyle said to Eric that they should try to "beat" the train.  Kyle does not know whether Eric heard his suggestion, or if Eric was even aware that a train was coming.

Defendants have submitted a video recording taken from a camera mounted on the front of the train.  The video depicts the train blowing its horn for approximately 21 of 30 seconds prior to reaching the Bemis Road crossing.  The video also shows that a car approached the tracks from the west and stopped prior to the crossing.  After the car came into view, the operator of the

2

train blew the horn almost continuously for seven seconds prior
to reaching the crossing.  During that time, Kyle crossed in
front of the train with Eric trailing behind.

As the train proceeded toward the crossing, Eric walked onto
the track.  Once on the track, Eric turned his head toward the
oncoming train.  He then continued across the track, lengthening
his strides.  It is undisputed that the train operator applied
the emergency brake at roughly the moment of impact.

Kyle testified in his deposition that after he heard the
train horn from his driveway, he did not hear it again until
approximately two seconds before Eric was killed.  The driver of
the vehicle that approached the tracks from the west, Michelle
Penza, testified in her deposition that she stopped just in time
to see the train and was initially afraid that it would hit her
vehicle.  Ms. Penza did not hear a horn before Eric was struck
and killed, though her car windows were closed and she was
listening to music at the time.  Witness Suzanne King was driving
her car on Route 142, parallel to the tracks, and saw Kyle and
Eric walking.  Like the other eyewitnesses, she did not hear the
train horn prior to the collision.  She was also surprised at the
train's high speed.

The speed limit for a passenger train on that section of
track is 55 miles per hour.  Readings from the train's data
recorder indicate a speed of 50 miles per hour at the time of the

accident.  A second report produced by Defendants indicates a
speed of 54 miles per hour.  As discussed more fully below,
Plaintiff contests the reliability, and thus the accuracy, of
Amtrak's video recording and its data recording.

## II.  The Amended Complaint

Defendants in this case are the National Railroad Passenger
Corporation doing business as Amtrak ("Amtrak"); track owner New
England Central Railroad, Inc. ("NECR"); the train's conductor,
Michael Kujala; and the train's engineer, William Rae.  Counts 1,
3, and 4 of the Amended Complaint allege negligence by Amtrak and
its employees, including: failure to require or provide an
adequate warning, both as to the frequency of horn blows and the
loudness of the horn; failure to keep a careful lookout; and
failure to slow or brake the train to avoid the collision.  Count
2 is brought in negligence against NECR, and claims a failure to
construct a safe and reasonable crossing; failure to maintain the
crossing in reasonable condition; failure to clear vegetation and
obstructions; failure to provide adequate sight lines for
motorists and pedestrians; failure to implement "FORM B"
protection; and failure to provide warning devices at the Bemis
Road crossing.

Notwithstanding the allegations in Count 2, Plaintiff has
since made clear in the briefing that the only claim being
brought against NECR is that it was negligent in maintaining the

4

vegetation at the crossing.  ECF No. 97 at 18.  Plaintiff has also clarified that it is not arguing: (1) that Amtrak (as opposed to NECR) was negligent in failing to evaluate the dangers of the crossing; (2) that Amtrak was negligent in failing to provide additional protection because the crossing was ultra-hazardous; or (3) that Amtrak hired a crew that it knew or should have known was incompetent.  *Id.*

### III. Disputes About the Data

Defendants have produced two printouts from the train's data recorder, as well as the video recording.  The first data printout was provided in discovery prior to the deposition of Amtrak's corporate representative, Harald Keuerleber.  The second data printout was produced at Mr. Keuerleber's deposition. Although derived from the same data source, there are differences in the two printouts.  Plaintiff contends that these differences render the data unreliable.

The primary difference in the data printouts is the wheel size.  Wheel sizes vary as the train's wheels wear out, and in the event of an accident the wheel size is measured contemporaneously by an Amtrak employee.[1]  Wheel size is

---

[1]  After moving for summary judgment, Defendants provided an affidavit from Thomas Rae.  Rae downloaded the event recorder data from the train shortly after the accident, and attests that he did not alter the data while it was on his laptop or after he transferred it to Amtrak's shared network drive.  ECF No. 104-4.  Amtrak's corporate designee, Mr. Keuerleber, had previously testified that a different individual downloaded the data.

significant because as the event recorder records the rotation of the wheels, wheel size dictates the calculation of the train's speed and distance traveled.  A smaller wheel size correlates to a slower speed.

The printout that was first produced in discovery (ECF No. 87-11) indicates a wheel size of 37.5.  Mr. Keuerleber brought a second printout to his deposition (ECF No. 98-3), with a wheel size entry of 41.  The smaller wheel size calculated to a speed of 50 miles per hour at the time of impact, while the larger wheel size calculated to 54 miles per hour.  Although Mr. Keuerleber was not able to explain the wheel size difference on the day of his deposition, his "errata" to the deposition testimony explains that 37.5 was the wheel size measurement at the time of the accident, while 41 is simply a default measurement.  Accordingly, he contends that the first-produced printout has the accurate information.

A piece of data that is *not* dependent on wheel size is the time at which the horn was sounded.  The data sheets measure horn blows in tenths of seconds, as signified by a "1" under each tenth of a second in which the horn was blowing.  There are small differences in the data sheets as to the precise timing of the horn blows, including a difference of .1 seconds at the time of impact (16:00.54).  Defendants attribute these small differences to the fact that the printouts were generated by different

versions of the software.  The printout with the correct wheel
size of 37.5 used the most recent software.

Plaintiff contends that the event recorders show the horn
continuing briefly after Eric is struck by the train, while in
the video the horn stops immediately.  Plaintiff argues that
these alleged differences are suspect, and criticizes Amtrak for
not maintaining a chain of custody record for the data recorder.

**IV.  Expert Opinions**

**A.  Plaintiff's Expert**

Plaintiff has retained Jimmy Scott, an expert on train
operations.  Mr. Scott's initial opinions included the following
conclusions: (1) the engineer failed to blow the horn at the
right time or in the right progression as required under federal
law; (2) a buildup of ice and snow on the three forward-facing
flutes caused the horn to sound muffled; (3) the engineer did not
reduce the speed of the train prior to applying the emergency
brake.

With regard to the blowing of the horn, Mr. Scott cites the
General Code of Operating Rules ("GCOR").  The GCOR reportedly
requires two long blasts, followed by one short blast and another
long blast before reaching a crossing.  Mr. Scott's report also
concludes that the horn did not blow *at all* during the 4.5
seconds immediately prior to the accident, based upon a police
report stating that the train stopped approximately 1/10 of a

7

mile (or 528 feet) beyond the collision point.

In a supplemental filing, Mr. Scott has offered his opinion about the engineer's efforts to slow the train prior to the collision. He believes that the engineer should have engaged the emergency brake as soon as Eric came into view. In the video recording, Eric can first be seen by the camera, and thus presumably by the engineer, at 4:26:03. He is struck at 4:32:50 of the same video. According to Mr. Scott, this gave the engineer approximately 6.5 seconds to react and slow the train. His conclusion is based, in part, on his opinion that after seeing Kyle Shippee cross the tracks with no intention of stopping, the engineer "should have engaged the train emergency brake upon seeing a second teenager close behind outwardly exhibiting the same lack of awareness of the train." ECF No. 118-1 at 3 (Scott Aff., ¶ 8).

All parties agree that in order to analyze potential application of the emergency brake prior to impact, allowance must be made for human reaction time. In his most recent affidavit, Mr. Scott refers the Court to a U.S. Department of Transportation ("USDOT") document that pertains to drivers of motor vehicles. The document states that "normal perception-reaction times vary from about 0.75 to 1.5 seconds depending on alertness, fatigue level, alcohol consumption, and age of the driver." ECF No. 118-1 at 19.

Using the high end of the USDOT reaction-time range, Mr. Scott calculates that with Eric coming into view 6.5 seconds prior to impact, and with a reaction time of 1.5 seconds, the train could have been braking for 5 seconds. He further calculates that during those 5 seconds, the train would have traveled six feet less if the brake had been applied. Based upon these calculations, Mr. Scott opines that the proximate cause of the collision was the engineer's failure to apply the brake.

**B.   Defendants' Expert**

Defendants' expert, Foster Peterson, offers his own opinion about the potential application of the emergency brake. He first concludes that it is not reasonable to expect an engineer to apply the brake when the person approaching the tracks is still more than "a second or two from stepping into the train's right of way. Every day, engineers observe cars and pedestrians approaching tracks and stopping just prior to reaching the tracks." ECF No. 117-1 at 2 (Peterson Aff., ¶ 8). He goes on to state that "[g]iving Plaintiff the benefit of the doubt," the engineer could only have discerned that Eric was not going to stop "when Eric was about 2-3 steps from the western edge of the track." *Id.* (Peterson Aff., ¶ 11).

Mr. Peterson also opines, without citation, that the "accepted perception-reaction time between the brain perceiving an imminent danger and action upon that perception is between 1½

and 2½ seconds." *Id.* (Peterson Aff., ¶ 9).  Given this reaction time, and the undisputed fact that it took the train 3 seconds to slow one mile an hour, Mr. Peterson concludes that "the accident was unavoidable regardless of whether the engineer applied the brakes when he did, or a few seconds earlier." *Id.* (Peterson Aff., ¶ 12).

## **Discussion**

## I.   **Reliability of the Data Recording and Video**

Before addressing questions of liability, the Court must resolve Plaintiff's challenge to the reliability of Defendants' data printouts and video.  Defendants concede that the printouts are not entirely consistent.

Defendants have clarified that one printout was based on the train wheels' actual diameter of 37.5, while the other was based upon a default wheel diameter of 41.  Defendants have also provided affidavits from the people who measured the wheel and downloaded the data.  As to the small differences in the data regarding the time at which the horn was blowing, Defendants surmise that those differences are due to the more recent software, and Plaintiff has offered nothing to counter that explanation.

There is no factual dispute about what the printouts say. The only question is whether the differences render both printouts unreliable.  Defendants have explained the differences,

while Plaintiff argues that a jury should determine reliability. Having reviewed all relevant evidence, the Court concludes that the first printout, developed using the actual wheel size and the most up-to-date software, is reliable.

Plaintiff also urges the Court to find inconsistencies between the printed data and the video, asserting that the horn in the video stops blowing after Eric was struck by the train, while the data recorder indicates that the horn continued to blow. In fact, the data recording reflects the horn blowing only briefly after impact, while the horn on the video also ceases shortly after impact. Nothing in the data recording discredits the video depiction.

Plaintiff further relies upon the eyewitness statements, each of which question whether and for how long the train blew its horn. At trial, the jury would be asked to weigh these accounts against the video. Defendants urge the Court to find, based in part upon the video, that there is no genuine factual dispute on these questions, and cite *Scott v. Harris*, 550 U.S. 372, 380 (2007) for the proposition that objective video evidence can resolve an issue of fact at summary judgment.

In *Scott*, the plaintiff claimed that in the course of a car chase, the police unnecessarily bumped his car causing him to crash and sustain serious injuries. Defendant moved for summary judgment and introduced a dashboard video which showed plaintiff

11

driving "shockingly fast . . . run[ning] multiple red lights . .
. [and] placing police officers and innocent bystanders alike at
great risk of serious injury."  *Scott*, 550 U.S. at 379-380.
Based upon the video, the Supreme Court concluded that the
plaintiff's "version of events is so utterly discredited by the
record that no reasonable jury could have believed it."  *Id.* at
380.

In this case, as in *Scott*, a video provides clear objective
evidence of the events leading up to Eric's death.  That evidence
shows the train operator blowing the horn consistently before
Eric reached the tracks.  The data from the event recorder
confirms the video.  Eyewitnesses do not recall hearing a
continuous horn, but as in *Scott*, their recollections are
discredited by the objective record.  Indeed, no reasonable
juror, upon viewing the video and being presented with the
printed data, could conclude that the horn failed to blow as
depicted.  Plaintiff suggests that the video has been doctored in
some way, but offers no evidence to support such conjecture.  The
Court therefore finds that there is no genuine issue of material
fact as to the events, including the blowing of the horn, shown
in Defendants' video.

## II.  Summary Judgment

### A.  Legal Standard

The Court now turns to the question of summary judgment.

Federal Rule of Civil Procedure 56 allows the Court to enter
summary judgment where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party.  A fact is material if it might
affect the outcome of the suit under the governing law." *SCR
Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.
2009).  In considering summary judgment, the Court construes the
evidence "in the light most favorable to the nonmoving party, and
draw[s] all inferences and resolv[es] all ambiguities in favor of
the nonmoving party." *Doro v. Sheet Metal Workers' Int'l Ass'n*,
498 F.3d 152, 155 (2d Cir. 2007).

    B.   The Horn Pattern and Federal Preemption

    Among Plaintiff's arguments for liability is the assertion,
supported by the opinion of Mr. Scott, that the train should have
blown its horn in a particular pattern.  Defendants counter that
the law upon which Mr. Scott relies applies only to public
crossings, that federal law preempts, and that there is no such
requirement under federal law for private crossings.

    The public/private status of Bemis Road is nominally
disputed.  It is undisputed, however, that the residents of Bemis
Road, and not the Town of Vernon, perform all road maintenance.
The road sign for Bemis Road reads "PVT," and there is a sign at

the crossing that states: "Private Crossing, Persons Using This Crossing Do So At Their Own Risk." ECF No. 87-20. Plaintiff has offered nothing to counter this evidence. The Court therefore finds that there is no genuine issue of material fact as to the status of Bemis Road as a private road.

Federal regulations do not "require the routine sounding of locomotive horns at private highway-rail grade crossings." 49 C.F.R. § 222.25. Federal regulations do provide, however, that where state law requires the sounding of a horn at a private crossing, the sounding must adhere to the pattern required under federal law. *Id.* Vermont law does not require a train to sound its horn prior to reaching a private crossing. *See* 5 V.S.A. § 3882(a). Given the lack of any state or federal requirement, the Court need not address the legal question of preemption, as irrespective of whether federal or state law governs, there is no such requirement.

C.   Common Law Duty

Setting aside preemption questions, Defendants concede that they had a common law duty of care to Eric as he approached and crossed the tracks. Mr. Keuerleber, testifying as Amtrak's corporate representative, allowed that the engineer of the train had a duty to watch out for Eric, a duty to warn Eric as he approached the crossing, and a duty to slow the train if Eric was not responding. Defendants contest whether Mr. Keuerleber's

14

statements, to the extent they are inconsistent with the law, impose any legal burdens.  In any event, the Court will apply common law principles of negligence to the Defendants' conduct.

In their initial summary judgment memorandum, Defendants urge the Court to apply the last clear chance rule as set forth in the Restatement (Second) of Torts, Section 480 comment c. That rule generally states that when a train engineer sees a pedestrian approaching a track, he or she may assume that the person will notice the train, and is under no obligation to provide an additional warning or to slow the train.  Vermont law, however, leans in Plaintiff's favor on this point.  Namely, in 1921 the Vermont Supreme Court explained the doctrine of last clear chance as follows:

> When the negligence of the defendant is proximate, and that of the plaintiff is remote, an action can be sustained.  Therefore, if there be negligence on the part of the plaintiff, yet, if at the time when the injury is committed it might have been avoided by the defendant by the exercise of reasonable care and prudence and could not then be avoided by the plaintiff by the exercise of such care and prudence, an action will lie.  So **the fact that the plaintiff was negligent in getting onto the track and in remaining there will not bar a recovery if the defendant in the exercise of due care had an opportunity to avoid injuring him after he could not avoid being injured.**  At the moment the plaintiff's ability to avoid the accident ceased, his negligence became remote; and that of the defendant then became proximate if at the same moment or later it could by the exercise of reasonable care and prudence have avoided the accident, and failed to do so.

*Miller v. Cent. Vermont Ry. Co.*, 113 A. 524, 525 (Vt. 1921) (emphasis supplied).  Furthermore, the last clear chance rule has

largely been abrogated by the emergence of comparative
negligence.  *See Eichelberg v. Nat'l R.R. Passenger Corp.*, 57
F.3d 1179, 1186-87 (2d Cir. 1995) ("The abolition of last clear
chance in Connecticut, as in other states, occurred as part of
the process in which the rule of contributory negligence was
replaced by comparative negligence.); 12 V.S.A. § 1036.

Defendants contend that Eric's own negligence was the
proximate cause of his death, and that they bear no
responsibility for the accident.  Specifically, they argue that
the undisputed facts show the train blew its horn immediately
before the accident, that the horn was in working order, that the
sight distances were clear, and that the train was operating
within the speed limit.  They also cite Vermont case law for the
proposition that a person crossing train tracks has a duty to use
appropriate caution.  *See, e.g., Mobbs v. Cent. Vermont Ry.,
Inc.*, 583 A.2d 566, 573 (Vt. 1990) ("A prudent driver approaching
a grade crossing . . . is presumed to have heard whatever there
was to be heard if he listened.  His failure to hear the horn
indicates that he did not exercise his hearing with reasonable
diligence."); *Starr's Transp. v. St. Johnsbury & Lamoille Cty.
R.R.*, 189 A.2d 525, 528 (Vt. 1963) (affirming directed verdict in
favor of railroad where plaintiff drove across track without
first stopping to look for the train).  Plaintiff counters that
Defendants were negligent in various ways, including failure to

16

blow the horn and apply the emergency brake in a reasonable
manner.

1.   The Train's Speed

Although not pressed by the Plaintiff, Defendants urge the
Court to find that the train was not speeding.  The date printout
with a wheel diameter of 37.5 indicates that the train was moving
at approximately 50 miles per hour at the time of the accident.
The second data printout, calculated using a wheel diameter of
41, shows a speed of 54.  Defendants submit that the first
printout is the accurate reading, and the Court accepts that
reading.  There is no dispute that the speed limit for a
passenger train traveling on that section of track was 55 miles
per hour.  It is thus undisputed that train was traveling within
the posted speed limit.

2.   The Blowing of the Horn

As discussed above, there was no legal requirement for a
particular horn pattern.  Nonetheless, there is no dispute that
the train operator had a duty to warn of the train's approach.
The video depicts the train blowing its horn intermittently
during the 30 seconds prior to crossing Bemis Road.  The data
recording supports that showing.

Plaintiff's expert concludes that the horn was not blowing
at the time of impact.  His conclusion is based on a police
report that appears to have approximated the distance the train

17

traveled (one tenth of a mile) after impact.  The train recorder
indicates that the train traveled 927 feet after the emergency
brake was first engaged, which was also the time of impact.  An
NECR employee measured the distance traveled after impact as 908
feet.  While the police approximation of distance was just that –
an approximation – the distances offered by Defendants are the
result of more refined measurements.  As no reasonable jurors
would favor the police estimation over Defendants' more precise
recordings, those same jurors would conclude that the horn was
blowing as it passed through the crossing.

Mr. Scott's conclusion about a buildup of ice and snow on
the flute of the horn is not supported by the undisputed weather
data.  No frozen precipitation, or precipitation of any sort,
fell along the train's route that day.  Accordingly, Defendants
are entitled to judgment as a matter of law as to any questions
regarding the blowing of the horn.

3.  Track Maintenance

The sole claim against NECR is that it failed to maintain
the vegetation at the Bemis Road crossing such that the sight
lines were adequate for both pedestrians and train operators.
Plaintiff's primary source for this conclusion is the testimony
of Kyle Shippee.  Kyle testified that the vegetation impeded the
sight lines, and that since the accident the impeding trees have
been removed.  Plaintiff offers no expert testimony with respect

18

to the adequacy of the sight lines.

Deposition testimony of an NECR witness, Track Foreman John Sullivan, countered Kyle's testimony, asserting that there was "easily" one hundred feet of sight distance from the position at which a car would stop at the crossing.  ECF No. 87-26 at 8. Sullivan further testified that NECR maintains the vegetation at the crossing, and that the track is inspected twice per week. *Id.* at 4.  Defendants' expert Foster Peterson testified that the sight line between the train and Eric was approximately 430 feet. ECF No. 98-4 at 13.

Federal regulations address the issue of vegetation on the side of railroad property.

> 49 C.F.R. § 213.37 requires railroads to control vegetation on railroad property which is on or immediately adjacent to the roadbed so that it does not obstruct visibility of railroad signs and signals. Section 213.37(d) requires railways to similarly control vegetation so that it does not hinder the functioning of signals.  Safeguarding the visibility and functioning of railroad signs and signals protects the safety of motorists at railroad crossings.  Section 213.37(b) and (d) obviously contemplate that overgrown vegetation could be hazardous to motorists at railroad crossings, but imposes only the duty to prevent the vegetation in and adjacent to the railbed from disrupting signs and signals.

*O'Bannon v. Union Pac. R. Co.*, 960 F. Supp. 1411, 1422-23 (W.D. Mo. 1997); *see also Anderson v. Wisconsin Cent. Transp.* Co., 327 F. Supp. 2d 969, 979-80 (E.D. Wis. 2004) (concluding that federal regulations preempt state law claims alleging vegetation on railroad property on or immediately adjacent to roadbed) (citing

19

*Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1554 (11th Cir. 1991)). *O'Bannon* concluded that while these regulations focus on vegetation as it impacts the visibility of signs and signals, visibility of the oncoming train is managed by the applicable speed limits. *Id*. (citing 39 C.F.R. § 213.9(a)).

The video evidence, as well as the testimony of Kyle Shippee, indicates that the vegetation in question was adjacent to the roadbed, thus bringing it within the purview of the federal regulations. As to the actual sight lines, the parties have not identified any Vermont statute or regulation requiring a specific line of sight at railroad crossings. Consequently, Plaintiff has offered no legal support for his claim that NECR failed to properly maintain the track area. Defendants' motion for summary on this claim is therefore **granted**.

4.   Application of the Brake

Plaintiff submits that the train's engineer should have applied the emergency brake several seconds prior to impact. Plaintiff's expert Jimmy Scott believes that the engineer should have responded as soon as Eric came into view – 6.5 seconds before impact – solely on the basis of Kyle Shippee's anticipated effort to cross in front of the train. Defendants' expert disagrees, concluding that the engineer could not have been alerted to a danger until Eric was, at most, two or three steps away from the tracks – at which time it would have been too late

to avoid a collision.

When Eric first came within view of the train, Kyle was approaching the closest (western) rail.  After Kyle crossed both rails, Eric was still eight or nine steps away from the western trail and was making no apparent effort to cross.  Defendants' expert, Foster Peterson, believes that it was unclear whether Eric would stop, and therefore unreasonable to expect the engineer to apply the emergency brake at that time.  Peterson goes on to state that "[g]iving Plaintiff the benefit of the doubt," the engineer could only have discerned that Eric was not going to stop "when Eric was about 2-3 steps from the western edge of the track."  *Id.* (Peterson Aff., ¶ 11).

Based upon the video evidence, the Court finds that it would be unreasonable to expect the engineer to apply the emergency brake when Eric first appeared in view.  Neither boy had crossed the track, and Eric was still several strides away from any potential danger.  In reaching this conclusion, the Court takes into consideration the fact that the Amtrak train in question was a passenger train.  The general rule with regard to a pedestrian approaching train tracks is that a locomotive engineer "is entitled to assume that the pedestrian will heed the warning and move to a place of safety."  *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 709 (2d Cir. 1989).  As explained by the Second Circuit, "this well-settled rule not only is a

common-sense recognition of how people act, it also takes into account the danger to passengers and crew inherent in emergency brake applications on rapidly moving trains." *Id.* at 710. Indeed, the engineer "owed his passengers the highest degree of care," and "[i]ndiscriminate use of emergency braking procedures is not consistent with the performance of this duty." *Id.*

As Defendants' expert Peterson notes in his affidavit, engineers "observe cars and pedestrians approaching tracks and stopping just prior to reaching the tracks" on a daily basis. ECF No. 117-1 at 2 (Peterson Aff., ¶ 8). To conclude here that the engineer of a passenger train should have applied the brake as soon as Eric came into view, while he was still many steps away and before his friend had crossed ahead of him, would be plainly unreasonable.

A reasonable juror could conclude, however, that Eric's intent became more clear as he proceeded toward the oncoming train and was only a few steps away from the track. At that point, a reaction by the engineer would have been fruitless as the train could not have slowed sufficiently to avoid impact. The train data recording indicates that as a result of two seconds of braking, the train's speed reduced just one mile per hour. ECF No. 87-11 at 3. Three seconds of braking resulted in a speed reduction of two miles per hour – from 50 miles per hour to 48 miles per hour. As discussed more fully below, these

decreases in speed would not have been sufficient to save Eric's life.

Indeed, even if the jury were to accept Plaintiffs' view of the facts and find that the engineer should have reacted 6.5 seconds prior to impact, reasonable jurors could not conclude that the failure to act was a proximate cause of the accident. Plaintiff's expert Scott opines that if the engineer had moved to activate the brake when he first saw Eric, and factoring in human reaction time, the train would have had 5 seconds to slow.[2] Assuming such slowing, Plaintiff contends that the train would have been 6 feet shy of Eric's position as he crossed the tracks, and that this difference would have saved his life.

The train data recorder makes clear that with a train traveling 50 miles per hour, application of the emergency brake does not bring about an immediate stop, but instead activates a gradual slowing.  Foster Peterson calculated that as a consequence of the train first slowing to 49 miles per hour and then to 48 miles per hour, it would have reached Eric .085

_____

[2] Plaintiff's expert concluded that Eric came into view 6.5 seconds before impact, and calculated 5 seconds of slowing using "the high end of the DOT [response time] range" of 1.5 seconds in order to avoid the need for expert opinion on what number in that range is most appropriate.  At summary judgment, however, the Court must view all facts in a light most favorable to the Plaintiff.  While the high end of the DOT reaction time range is 1.5 seconds, the low end is .75 seconds.  Adding .75 seconds of slowing time to the calculations below would result in the train reaching Eric only a few hundredths of a second later than calculated – a difference that any reasonable juror would find inconsequential.

23

seconds later than it actually did.  ECF No. 117-1 at 5.
Peterson further submits, based upon the video, that Eric was
crossing the tracks at an apparent rate of 2.5 miles per hour, or
3.67 feet per second.  Plaintiff has not disputed these latter
calculations.  Assuming a train speed of 48 miles per hour, Eric
would have moved approximately three inches further in .085
seconds.  ECF No. 119 at 2.

The issue for the jury would be whether those few additional
inches would have made a difference.  Plaintiff argues that Eric
was in the process of diving out of the way, but offers only a
glimpse of Eric's position on the video in support.  Defendants'
expert submits that Eric would have needed a full extra second to
escape harm, and that in order to afford that much time, the
train engineer would have needed to apply the brake seven seconds
before impact.  ECF No. 117-1 at 4.  Seven seconds would have
required application of the brake before Eric came into view of
the train – clearly an unreasonable expectation.

The question presented at summary judgment is whether,
viewing the facts in a light most favorable to the Plaintiff, a
reasonable juror could conclude that Defendants are liable for
Eric's death.  Even accepting each of the facts put forth by the
Plaintiff in terms of what the engineer should have seen, and
what he should have done in the seconds prior impact, it is plain
that Plaintiff's desired reaction by the engineer would have

resulted in the train reaching Eric only hundredths of a second later than it did.  Given that calculation, no reasonable juror could conclude that the engineer's alleged negligence in failing to activate the brake prior to impact was a proximate cause of Eric's death.

The Court acknowledges that "[o]rdinarily, proximate cause is a jury issue unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." *Kuligoski v. Brattleboro Retreat*, 2016 VT 54, ¶ 19.  Here, the facts are sufficiently clear that the engineer could not have reasonably responded in a manner that would have saved Eric's life.  Defendants are therefore entitled to summary judgment on Plaintiff's claim.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 87) is **granted**, and this case is **dismissed**.

Dated at Burlington, in the District of Vermont, this 17th day of June, 2016.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge